THE STATE, EX REL. CELEBREZZE, APPELLANT, *v.* ENVIRONMENTAL
ENTERPRISES, INC. ET AL., APPELLEES.

[Cite as State, ex rel. Celebrezze, *v.* Environmental Enterprises, Inc.
(1990), 53 Ohio St. 3d 147.]

(No. 89-1226—Submitted May 30, 1990—Decided August 29, 1990.)

*Anthony J. Celebrezze, Jr.,* attorney general, *Bryan F. Zima, Phillip E. Haffenden* and *Shane A. Farolino,* for appellant.

*Taft, 'Stettinius & Hollister, Thomas D. Heekin, Kim K. Burke* and *Susan E. Wheatley,* for appellees.

DOUGLAS, J. Appellant appeals to this court challenging the order of the court of appeals remanding appellees' counterclaim to the trial court, and the judgment of the court of appeals regarding Counts VII and XV of appellant's complaint as those counts relate to appellee EEI.

I

In Count VII of its complaint, appellant alleged that in April 1986, appellees improperly stored hazardous wastes in violation of Ohio Adm. Code 3745-66-71, which provides that:

"If a container holding hazardous waste is not in good condition, or if it begins to leak, the owner or operator [of a facility] shall transfer the hazardous waste from such container to a container that is in good condition, or manage the waste in another manner that complies with the requirements of the hazardous waste facility interim standards chapters of the Administrative Code."

The evidence produced at trial shows that on the morning of April 21, 1986, Ohio EPA inspectors conducted an inspection of EEI's Spring Grove hazardous waste treatment, storage and disposal facility in Cincinnati, Ohio. The inspectors observed boxes that were located outside the facility. Some of the boxes were covered by plastic and others appeared to have had the plastic covering blown off and were, thus, uncovered. The boxes appeared to be wet and at least one of the boxes was split at the bottom, allowing some hazardous material to leak out. Hazardous material also spilled from one of the uncovered boxes. The material which had spilled or leaked was cleaned up upon discovery and transferred to containers in good condition. Rain had apparently fallen sometime prior to the inspection. The hazardous materials in the boxes caused some of the boxes to bulge.

Appellees' plant manager testified that some of the boxes were placed outside the facility approximately twelve to eighteen hours prior to their being discovered by the Ohio EPA inspectors. One inspector was told that these boxes had been placed outside the facility to be picked up by a truck expected early on the morning of April 21. On the morning of April 21, prior to the inspection, EEI employees observed the boxes, all of which were covered, and no box was leaking.

Based upon this and other evidence, the trial court found that appellees violated Ohio Adm. Code 3745-66-71. The court of appeals found that the record in this case is devoid of evidence concerning the length of time that the boxes had been leaking. Further, the court of appeals found that appellees caused the hazardous material to be transferred to containers in good condition upon discovery of the leak and, thereby, complied with Ohio

Adm. Code 3745-66-71. Accordingly, the court of appeals, pursuant to App. R. 12(C), reversed the judgment of the trial court and entered judgment on Count VII of the complaint in favor of EEI. As this case was tried to the court, and not a jury, we conclude that the court of appeals was clearly within its authority to reverse the trial court and enter judgment for EEI under App. R. 12(C) and, therefore, we affirm this portion of the appellate court's judgment. In doing so, we decline to make a determination regarding the weight of the evidence. See R.C. 2503.43.

## II

In Count XV of its complaint, appellant alleged that appellees failed to take adequate precautions against a fire which had occurred in September 1986 and, thereby, violated Ohio Adm. Code 3745-65-17(A), which provides in relevant part that:

"The owner or operator [of a facility] shall take precautions to prevent accidental ignition or reaction of ignitable or reactive waste. This waste shall be separated and protected from sources of ignition or reaction including, but not limited to: open flames, * * * frictional heat, sparks (static, electrical, or mechanical) * * *."

The evidence produced at trial shows that on September 3, 1986, a fire occurred at EEI's facility while EEI's employee, David Jones, was shredding aerosol cans containing flammable materials. The fire occurred when Jones entered the "shredder room" and attempted to start a forklift. A spark caused the ignition of flammable materials. Jones was warned not to start the forklift but, nevertheless, turned the key in the ignition, causing an explosion and a fire. Jones was severely burned. Testimony indicated that prior to the explosion Jones may have removed fuses and sensors from a gas monitoring system contained in the shredder room which rendered inoperable the system designed to detect dangerous levels of explosive vapor and sound a warning alarm in the event of danger. Jones and others had removed the fuses on several occasions. Jones was terminated following the September 3, 1986 fire.

The trial court found that the safety precautions taken by EEI to prevent the ignition of hazardous materials were adequate. Nevertheless, the trial court found that EEI was vicariously liable for the acts of its employee and, thus, EEI had violated Ohio Adm. Code 3745-65-17(A). The court of appeals reversed the trial court, holding that EEI was not vicariously liable for Jones's acts. As this case was tried to the court, and not a jury, we conclude that the court of appeals was clearly within its authority to reverse the trial court and enter judgment for EEI under App. R. 12(C) and, therefore, we affirm this portion of the appellate court's judgment. In doing so, we decline to make a determination regarding the weight of the evidence. See R.C. 2503.43.

## III

The trial court dismissed appellees' counterclaim. The court of appeals reversed the judgment of the trial court and remanded the counterclaim for further proceedings. The final issue before us is whether the court of appeals erred in this regard.

In the counterclaim, appellees sought a declaration that Ohio's hazardous waste program was unenforceable under state and federal laws. Appellees alleged that Ohio had lost its federal authorization to operate a hazardous waste program on January

31, 1986. Further, appellees alleged that Ohio EPA had made demands inconsistent with and inequivalent to demands made by the United States Environmental Protection Agency ("U.S. EPA"), thereby rendering Ohio's hazardous waste laws invalid and unenforceable. In effect, appellees sought to have the trial court declare that Ohio's hazardous waste program was preempted by federal legislation.

Appellant suggests that a counterclaim seeking declaratory relief is both an inappropriate and unavailable mechanism for challenging the enforcement of Ohio's hazardous waste laws. We do not agree. In *Pack* v. *Cleveland* (1982), 1 Ohio St. 3d 129, 1 OBR 166, 438 N.E. 2d 434, paragraph one of the syllabus, we held that:

"Any person whose rights, status or other legal relations are affected by a law may have determined any question of construction or validity arising under such law, where actual or threatened prosecution under such law creates a justiciable controversy. Courts of record may declare rights, status and other legal relations, and the declaration may be either affirmative or negative in form and effect. (R.C. 2721.01 and 2721.03 applied.)"

In the case *sub judice*, appellees seek a declaration that Ohio's entire scheme for regulation of hazardous waste is unenforceable and invalid and that appellees' prosecution under the law is impermissible. As such, according to *Pack*, appellees could properly seek a declaration of their rights under the alleged invalid laws. However, the trial court apparently viewed appellees' counterclaim not as an independent claim for relief but, rather, as a defense to appellant's complaint. As such, the trial court dismissed appellees' counterclaim as "moot" or "not relevant" after finding against EEI on Counts VII and XV of the complaint. The court of appeals held, and we agree, that the trial court erred in this determination.

A counterclaim may be asserted offensively as an independent claim against an opposing party. See 1970 Staff Note to Civ. R. 13(C). Appellees' counterclaim seeking declaratory and injunctive relief was not dependent upon the success or failure of appellant's complaint and was, thus, independent in nature. Therefore, appellees' counterclaim was not rendered "moot" based upon the trial court's findings.

However, we are not prepared to say that the trial court erred in dismissing appellees' counterclaim. According to the court of appeals, appellees set forth a cognizable claim for relief when the pleadings are viewed in a light most favorable to them. We disagree. For the reasons set forth below, we hold that appellees' counterclaim fails to state a claim upon which relief can be granted and, thus, we reverse the judgment of the court of appeals and reinstate the judgment of the trial court dismissing appellees' counterclaim.

The Resource Conservation and Recovery Act of 1976 ("RCRA"), Section 6901 *et seq.,* Title 42, U.S. Code, was enacted to provide, *inter alia,* improved methods for the proper disposal of solid wastes through federal action, although the collection and disposal of solid wastes was to remain primarily a matter for the several states. Section 6901(a)(4), Title 42, U.S. Code. Under RCRA, certain states could seek the approval of the Administrator of U.S. EPA for the state to temporarily operate a hazardous waste program in lieu of the federal program regulating hazardous waste. Section 6926(c), Title 42, U.S. Code. Likewise, a state could seek final approval from the Administrator of

U.S. EPA to operate a state program in lieu of the federal program. Section 6926(b), Title 42, U.S. Code. To obtain final approval, a state's hazardous waste management program must: (1) be equivalent to the federal program, (2) be consistent with the federal program and other state programs which have received final authorization, and (3) provide adequate enforcement. *Id.* RCRA specifically provides that no state may fall below the minimal standards established under RCRA. Section 6929, Title 42, U.S. Code. However, RCRA also specifically provides that nothing prohibits the states from imposing standards which are more stringent than required under RCRA. *Id.*

Ohio's interim authorization to operate its hazardous waste program expired on January 31, 1986 by operation of the Hazardous and Solid Waste Amendments of 1984, Pub. L. No. 98-616, 98 Stat. 3254 (1984). As a result, and since Ohio had not obtained final authorization to run its program after the January 31, 1986 expiration date, authority to implement the RCRA hazardous waste management program reverted to U.S. EPA. Even before the January 31, 1986 expiration date, Ohio and the regulated community were notified, by way of publication, that Ohio's interim authorization could expire with the resultant reversion of the authority to operate the program to U.S. EPA. 50 Fed. Reg. 48406-48407 (Nov. 25, 1985) (to be codified at 40 C.F.R. Part 271). This notice provides in relevant part that:

"The regulated community should take particular note that beginning January 31, [1986] hazardous waste handlers in States whose interim authorization expires will be required by law to comply with the Federal regulations in Title 40 of the Code of Federal Regulations, Parts 124,

260-265 and 270, *as well as the State regulations. * * * The State will continue to implement its State hazardous waste program, as this program remains in effect under State law.*" (Emphasis added.) *Id.*

The notice further provides that if a state has regulations comparable to the federal regulations and if the state is responding to violations of state law in a timely and appropriate manner, U.S. EPA expects to defer to the state's administrative and judicial proceedings without initiating parallel enforcement action to enforce the federal requirements. *Id.* at 48407.

Subsequently, the state of Ohio was again notified that its interim authorization was expected to revert to U.S. EPA. Once again, notice was given to the state of Ohio, and the regulated community, that:

"The regulated community should take particular note that beginning January 31, [1986] hazardous waste handlers in States whose interim authorization expires will be required by law to comply with the Federal regulations in Title 40 of the Code of Federal Regulations, Part 124, 260-265 and 270, *as well as the State regulations. * * * The State will continue to implement its State hazardous waste program, as this program remains in effect under State law.*" (Emphasis added.) 51 Fed. Reg. 4128 (Jan. 31, 1986).

With the foregoing discussion in mind, and assuming, as we must, that the factual allegations contained in appellees' counterclaim are true, we are unable to conclude that Ohio could not enforce its hazardous waste program after Ohio's interim authorization lapsed, but before it received final authorization by U.S. EPA.

To dismiss appellees' counterclaim for failing to state a claim, all allegations contained in the counterclaim

must be accepted as true. *Mitchell* v. *Lawson Milk Co.* (1988), 40 Ohio St. 3d 190, 192, 532 N.E. 2d 753, 756. Further, in *O'Brien* v. *University Community Tenants Union* (1975), 42 Ohio St. 2d 242, 71 O.O. 2d 223, 327 N.E. 2d 753, syllabus, we held:

"In order for a court to dismiss a complaint for failure to state a claim upon which relief can be granted (Civ. R. 12(B)(6)), it must appear beyond doubt from the complaint that the plaintiff can prove no set of facts entitling him to recovery. * * *" (Citation omitted.)

Therefore, we accept as true appellees' allegations that Ohio's hazardous waste program "floundered" and on January 31, 1986, U.S. EPA revoked Ohio's authority to operate a hazardous waste program in lieu of the federal program; and that Ohio has issued rules and made demands upon EEI which are inconsistent with, and not equivalent to, the rules and demands made upon EEI by U.S. EPA. Even so, we do not believe that these facts make Ohio's rules and regulations unenforceable or that federal law preempts Ohio's regulation of hazardous waste.

RCRA provides that states may have more stringent standards than those required under RCRA Section 6929, Title 42, U.S. Code. Hence, if appellees are alleging a violation of RCRA because the "inconsistency" or "inequivalency" between state and federal law is due to Ohio's standards being greater than those required under RCRA, appellees' contentions are frivolous. If appellees are alleging a violation of RCRA because the "inconsistency" or "inequivalency" between state and federal law is due to Ohio enforcing less stringent standards than are required by U.S. EPA, appellees would suffer no prejudice as a result of the inconsistent or ine-

quivalent standards. In this scenario, appellees would still have to abide by the greater standard established under RCRA if U.S. EPA actively sought to enforce the federal program.

Furthermore, it is clear from our discussion that the withdrawal of Ohio's interim authorization did not affect its ability to enforce state laws governing hazardous wastes. Ohio does not derive its rights to regulate hazardous wastes from U.S. EPA. Indeed, for states in which interim authorization was expected to lapse, the regulated community was told that the states would continue to implement the state hazardous waste laws.

It is also clear that RCRA is not meant to preempt state hazardous waste management laws. "Preemption," or federal displacement of state regulation, will not be declared unless such displacement was the clear and manifest purpose of Congress. *Rice* v. *Santa Fe Elevator Corp.* (1947), 331 U.S. 218, 230. We find that all the evidence available leads to the conclusion that preemption was *not* the purpose of Congress in enacting RCRA.

Nevertheless, appellees contend that Ohio's rules and regulations, as interpreted and applied, make it impossible for appellees to comply with federal standards. In effect, appellees argue that if they comply with the federal standards, they will violate Ohio law, and if they comply with Ohio's standards, they will violate federal law. In such a situation, federal preemption may be found to apply. See *Florida Lime & Avocado Growers, Inc.* v. *Paul* (1963), 373 U.S. 132, 142-143 (federal exclusion of state law is inescapable where compliance with both federal and state regulations is a "physical impossibility"). However, appellees did not plead that the inconsistency between Ohio's regulations and the federal regulations made it a physical

impossibility for appellees to comply with the dual requirements. A mere "inconsistency" between the two sets of regulations does not lead to the conclusion that the state regulations must be displaced by the federal regulations. An exclusion of state law will not be assumed despite dissimilarities between the dual regulations absent such "physical impossibility" of dual compliance, or absent a clear Congressional purpose to preempt.

Additionally, appellees alleged in the counterclaim that Ohio lost its authority to operate a hazardous waste program under R.C. Chapter 3734. R.C. 3734.12 provides in relevant part that:

"The [Ohio] director of environmental protection shall adopt and may modify, suspend, or repeal rules in accordance with Chapter 119. of the Revised Code, which shall be consistent with and equivalent to the regulations promulgated under * * * [RCRA]."

Appellees contend that the *interpretation* and *administration* of Ohio's rules are inconsistent with, and inequivalent to, the interpretation and application of U.S. EPA rules and, hence, Ohio's rules are unenforceable. However, R.C. 3734.12 does not address the interpretation or administration of rules but, rather, applies to rules adoption, modification, suspension and repeal. In any event, appellees sought relief in the form of a declaration that Ohio lost its authority to operate a hazardous waste program. Even if we were to conclude that some of Ohio's rules differ from federal rules and that such rules promulgated under R.C. 3734.12 would, therefore, be rendered invalid, we would not find that Ohio's entire hazardous waste program would be invalidated as a result.

Accordingly, we affirm the judgment of the court of appeals regarding Count VII and Count XV of the complaint. Further, we find that the trial court properly dismissed appellees' counterclaim for the foregoing reasons and, thus, we reverse the judgment of the court of appeals with respect thereto.

*Judgment affirmed in part and reversed in part.*

MOYER, C.J., HOLMES and WRIGHT, JJ., concur.

SWEENEY, H. BROWN and RESNICK, JJ., concur in part and dissent in part.

ALICE ROBIE RESNICK, J., concurring in part and dissenting in part. I concur in the majority's reversal of the court of appeals' decision as to the counterclaim. However, I must respectfully dissent from the majority's affirmance as to Counts VII and XV.

I

The majority states that "* * * we decline to make a determination regarding the weight of the evidence." I agree that it is not a function of this court to reweigh the evidence. It is, however, our duty to determine whether the court of appeals was correct in its assessment of the trial court's decision as to the manifest weight of the evidence.

A fundamental tenet of appellate review is that a trial court's findings will not be reversed if there is competent, credible, evidence going to all the essential elements of the case. *C.E. Morris Co.* v. *Foley Constr. Co.* (1978), 54 Ohio St. 2d 279, 8 O.O. 3d 261, 376 N.E. 2d 578. "The law in Ohio is clear that an appellate court will not disturb the findings of the trier of fact unless they are against the manifest weight of the evidence. * * * [Citations omitted.]

Moreover, if the judgment of the trial court is supported by some competent, credible evidence, it will not be reversed by a reviewing court as being against the manifest weight of the evidence. * * *'' (Citations omitted.) *Kinney* v. *Mathias* (1984), 10 Ohio St. 3d 72, 73, 10 OBR 361, 362, 461 N.E. 2d 901, 903. Thus, it is axiomatic that an appellate court may not simply substitute its judgment for that of the trial court so long as there is some competent, credible evidence to support the lower court findings. The court of appeals and a majority of this court have not given due deference to this standard. A comprehensive review of the record and proper statutory interpretation compel this conclusion.

Count VII of the complaint alleges a violation of Ohio Adm. Code 3745-66-71. This rule was adopted by the Ohio Environmental Protection Agency. The rule-making powers of the Director of Environmental Protection emanate from R.C. 3734.12: "The director of environmental protection shall adopt and may modify, suspend, or repeal rules in accordance with Chapter 119. of the Revised Code * * *." Other relevant portions of this statute state as follows:

"(B) Establishing standards for generators of hazardous waste necessary to protect human health or safety or the environment in accordance with this chapter, including, but not limited to, requirements respecting:

"* * *

"(3) Use of appropriate containers for hazardous waste[.]"

The enforcement and penalty provisions regarding violations of R.C. Chapter 3734, *or administrative rules adopted thereunder,* are set forth in R.C. 3734.13, and provide in pertinent part:

"(C) If the director determines that any person is violating or has violated this chapter, *a rule adopted thereunder,* or a term or condition of a permit, license, variance, or order issued thereunder, the director may request in writing that the attorney general bring a civil action for appropriate relief, including a temporary restraining order, preliminary or permanent injunction, and civil penalties in any court of competent jurisdiction. *Such an action shall have precedence over all other cases. * * *"* (Emphasis added.)

From the above statutes, two observations can readily be made: (1) that under R.C. Chapter 3734, the General Assembly has given the Ohio EPA broad powers to adopt rules that protect human lives as well as our environment; and (2) that the General Assembly considers any alleged violations of these rules serious enough so that any action filed by the Attorney General pursuant to these rules is to be given "precedence over all other cases."

In adopting the challenged administrative rule, the Director of Environmental Protection was merely carrying out the intent of the General Assembly, and was acting under a specific grant of legislative authority. "Administrative rules enacted pursuant to a specific grant of legislative authority are to be given the force and effect of law." *Doyle* v. *Ohio Bur. of Motor Vehicles* (1990), 51 Ohio St. 3d 46, 554 N.E. 2d 97, paragraph one of the syllabus. When interpreting this provision, this court should properly follow the philosophy of the federal courts of appeals: statutes designed by the legislature to protect and preserve public health and the environment *must be liberally construed to avoid frustration of the beneficial legislative purpose.* See *Dedham Water Co.* v. *Cumberland Farms Dairy, Inc.*

(C.A.1, 1986), 805 F. 2d 1074, 1081; *United States* v. *Johnson & Towers, Inc.* (C.A.3, 1984), 741 F. 2d 662, 666. See, also, *United States* v. *Conservation Chemical Co.* (W.D. Mo. 1985), 619 F. Supp. 162, 192; *United States* v. *Mottolo* (D. N.H. 1985), 605 F. Supp. 898, 902.

Ohio Adm. Code 3745-66-71 provides as follows: "If a container holding hazardous waste is not in good condition, or if it begins to leak, the owner or operator shall transfer the hazardous waste from such container to a container that is in good condition, or manage the waste in another manner that complies with the requirements of the hazardous waste facility interim standards chapters of the Administrative Code."

The court of appeals below held that the rule was directory and not proscriptive. Such a construction is clearly erroneous, particularly in view of the above statutes that not only give the director authority to adopt such rules, but expressly provide a wide range of penalties for their violation. See R.C. 3734.13. The appellate court's interpretation of Ohio Adm. Code 3745-66-71 implies that the rule can *never* be violated under any circumstances since under such a holding hazardous waste need only be transferred from a defective or leaking container to a container in good condition to be in compliance. Yet, the record in this case could not more clearly demonstrate a violation in that the transfer was not made until requested by the Ohio EPA inspectors. This is evidenced by EEI's plant manager, Thomas W. Fleming, who testified as follows:

"Q: What was exactly out on the back pad to the best of your recollection?

"A: To my best memory I believe they [sic] were 6 boxes, I would estimate there were 6 boxes, there were several just at the bottom of the staircase, * * *.

"Q: And what was in these boxes?

"A: The boxes contained individually some tank sludge, some acid, a sludge that was from an acid neutralization process and some boxes contained a heavy metal sludge — I'm sorry, a waste water treatment sludge.

"* * *

"Q: Was it being handled as hazardous waste?

"A: Yes, it was.

"Q: Do you know how long these cardboard boxes had been in this location outside the caustic room?

"A: I thought about that and when we spoke on the deposition the best of my reckoning was 12 to 18 hours.

"* * *

"Q: What was the condition of the boxes themselves?

"A: I can remember that the heavy metal sludge was causing the boxes to bulge, it is by nature heavy metal is just that, it is very heavy material and it was bulging the boxes and I recall one of the boxes of waste water treatment sludge had a tear in the bottom of one of the boxes and some material was out of that box.

"Q: Were the boxes wet?

"A: Yes."

From the foregoing, it is clear that the boxes, which contained hazardous wastes, were placed on a loading pad, that they became wet and that at least one box was leaking. The plant manager's testimony indicated the material had been there through at least two working shifts — about twelve to eighteen hours. Moreover, there was testimony that these materials were to be picked up for transportation to a landfill, but that the truck was "discontinued." Lastly, and perhaps even more

egregious, the record disclosed that inspectors from EEI had not once, but twice, failed to discover leakage from these boxes on routine inspections.

The evidence regarding the condition of these boxes was also supported by testimony from an inspector from the Ohio EPA, Paul D. Pardi, who testified as follows:

"Q: What observations did you make in this area?

"A: Several of the boxes, some of the boxes had a plastic cover on them and on others it appeared that the plastic cover had blown off to the side so many of the boxes weren't covered. A lot of them were, they appeared to be wet and on a couple of the boxes they were split down to the bottom of the box at one corner and this allowed some of the material that was stored in the boxes to leak out.

"* * *

"Q: Did any of these boxes have actual lids to them, the box itself?

"A: Not that I recall, no, it was just plastic draped over the top."

The court of appeals concluded that "[t]he record is devoid of evidence as to how long the boxes had been leaking, and evidence is uncontroverted that, in both instances, upon discovery of the condition of the boxes, the material was transferred to containers in good condition." From this reasoning, the appellate court went on to hold that the trial court's finding was against the manifest weight of the evidence. The appellate court could not have been more misguided. The length of time these containers were leaking is not the determinative factor in this case. Ohio Adm. Code 3745-66-71 provides in pertinent part: "If a container holding hazardous waste is not in good condition, or if it begins to leak, the owner or operator shall transfer * * * or manage the waste in another manner that complies with the

* * * [rule]." In the case presently before us the plant manager testified that "heavy metal sludge was causing the boxes to bulge, it is very heavy material and it was bulging the boxes * * *." From this it is apparent that there was a violation of Ohio Adm. Code 3745-66-71 in that these containers were not of sufficient quality to keep the contents securely within their confines. The containers being used by EEI were being torn open by the contents and hence EEI was required to "manage the waste in another manner." Simply placing this heavy metal sludge in a new container was not going to solve the problem and be in compliance with the rule in question. The contents, i.e., heavy metal sludge, given time, would split the container and would enter the earth's environment.

EEI's own inspectors should have discovered these problems and corrected them without having to be told to do so by the Ohio EPA inspector. The inability on the part of EEI to observe and immediately correct the problem evinces its total disregard of Ohio Adm. Code 3745-66-71. These containers were filled with hazardous waste and they were to be deposited in a landfill in a defective condition. The fact that the boxes were in defective condition due to their contents (the heavy metal sludge) and leaking, coupled with the failure of EEI's own inspectors to discover the problem, constituted a violation of the administrative rule. It is immaterial that the contents of the boxes were immediately transferred to better containers when EEI was informed of their condition by the Ohio EPA inspector. The violation had already taken place. The majority's avoidance of this issue is surprising especially in view of the dangers created to the environment through the disposal of

hazardous waste in unsafe containers such as those involved in this case. Moreover, its implied finding that the above testimony and evidence *do not* constitute some competent, credible evidence to support a violation of Ohio Adm. Code 3745-66-71 is unfounded.

Finally, today's ruling should serve to draw the attention of the General Assembly, and the general public as well, to rectify any perceived or possible loophole in the present law which has been relied upon by the court of appeals and a majority of this court. I fear that this holding sets a dangerous precedent, and may inhibit both the Ohio EPA and the Attorney General when they seek to enforce similar rules in the future. Based on the foregoing reasons, I would reverse the decision of the court of appeals as to Count VII.

## II

Additionally, I disagree with the majority's holding as to Count XV of the complaint. This count charged appellee with violating Ohio Adm. Code 3745-65-17(A). The count alleged that on September 3, 1986, appellee failed to take adequate precautions to prevent accidental ignition of ignitable waste, contrary to the above rule. The trial court held that EEI was vicariously liable for the actions of its foreman. However, the court of appeals reversed this finding. The appellate court held that the foreman had acted outside the scope of his authority, and that EEI had not ratified his conduct. The basis for this conclusion was that the foreman had acted in contravention of procedure, and that upon learning of his actions, he was discharged by EEI. The appellate court suggests that by simply firing an employee, an employer can be relieved of liability. Less than one year ago this court stated, *in syllabus law,* that "[a]n employer does not escape liability for

violation of a specific safety requirement by giving a supervisory employee the responsibility to comply with such safety requirement. *The ultimate responsibility remains with the employer.*" (Emphasis added.) *State, ex rel. Cotterman,* v. *St. Marys Foundry* (1989), 46 Ohio St. 3d 42, 544 N.E. 2d 887. Thus, appellee cannot simply disclaim responsibility for the violation of a safety requirement by showing its employee is responsible for said violation. The ultimate responsibility to comply with safety rules rests with the employer, and cannot be shifted in the manner suggested by appellee.

The law in Ohio regarding the "scope of employment" was succinctly set forth in *Posin* v. *A.B.C. Motor Court Hotel, Inc.* (1976), 45 Ohio St. 2d 271, 278-279, 74 O.O. 2d 427, 431-432, 344 N.E. 2d 334, 339-340, and needs no embellishment:

"The term 'scope of employment' has never been accurately defined and this court has stated that it cannot be defined because it is a question of fact and each case is *sui generis.* It has also been stated that the act of an agent is the act of the principal within the course of the employment when the act can fairly and reasonably be deemed to be an ordinary and natural incident or attribute of the service to be rendered, or a natural, direct, and logical result of it. *Tarlecka* v. *Morgan* (1932), 125 Ohio St. 319.

"A servant who departs from his employment to engage in affairs of his own relieves the master from liabilities for his acts. *Railway* v. *Shields* (1890), 47 Ohio St. 387; *White Oak Coal Co.* v. *Rivoux* (1913), 88 Ohio St. 18.

"It is recognized, however, that not every deviation from the strict course of duty is a departure such as will relieve a master of liability for the acts of a servant. The fact that a servant, while performing his duty to his

master, incidentally does something for himself or a third person, does not automatically relieve the master from liability for negligence which causes injury to another. *Loughead Co.* v. *Hollenkamp* (1924), 3 Ohio Law Abs. 558.

"To sever the servant from the scope of his employment, the act complained of must be such a divergence from his regular duties that its very character severs the relationship of master and servant. *Amstutsz* v. *Prudential Ins. Co.* (1940), 136 Ohio St. 404. See, generally, 36 Ohio Jurisprudence 2d, Master and Servant, Section 386 *et seq.*; 53 American Jurisprudence 2d, Master and Servant, Section 426 *et seq.*"

Initially, it must be pointed out that whether the act of an employee is within the scope of his employment *is a question of fact.* As such, it is properly left within the province of the trier of fact. See *Wiebold Studio, Inc.* v. *Old World Restorations, Inc.* (1985), 19 Ohio App. 3d 246, 251, 19 OBR 398, 403, 484 N.E. 2d 280, 287 ("The court made no error in presenting the issue to the jury, because what is the 'scope of employment' and whether particular acts fall within it are, generally, issues of fact for determination by the trier of fact. * * * [Citations omitted.]") Thus, a finding on this issue may not be reversed by a reviewing court if there is some competent, credible evidence to support such finding. Therefore, the standard of review for the court of appeals should have been a manifest-weight-of-the-evidence analysis. Upon applying the proper analysis, it is clear that the record provides ample evidence to support the trial court's finding that appellee's foreman was in the scope of his employment, and consequently that appellee was vicariously liable for his acts.

The record clearly demonstrates that the foreman was in the location of the fire during his work shift, and was performing job-related tasks that were beneficial to appellee. Indeed, another employee in the area of the fire testified as follows:

"Q: Are you familiar with a fire that occurred at the shredder room on September 3 of 1986?

"A: Yes.

"Q: Were you present that day?

"A: Yes.

"Q: Were you present in the room at the time the fire occurred?

"A: Yes.

"Q: Would you tell the court what happened?

"A: I was shredding and I shut it off and went in to adjust the nitrogen flow and when I did Dave Jones [the foreman] came from outside, was going past me and I hollered because I knew he was going to get on the forklift to start it and I hollered at him when he went by not to start the forklift but he just smiled and went on and got on the forklift and I started to holler again, I said Dave, don't start it and that's as far as I got and.

"Q: I'm sorry, when you said that's as far as I got, what happened?

"A: He just smiled at me and turned the key and when he did it just blew up.

"Q: And there was a fire?

"A: Yes, sir.

"* * *

"Q: Was Mr. Jones shredding with you that evening?

"A: No, sir.

"Q: Do you know why he was in the room?

"A: I think he was trying to push the, hurry the process up.

"Q: When you say hurry the process up what do you mean?

"A: Everything was going good

and steady and I guess he tried to push the process too fast."

Thus, from the above testimony it is clear that the foreman was performing job-related duties beneficial to his employer. As noted above, in order to sever the servant from the scope of his employment, "* * * the act complained of must be such a divergence from his regular duties that its very character severs the relationship of master and servant." *Posin, supra,* at 278, 74 O.O. 2d at 431-432, 344 N.E. 2d at 340. The foreman's acts cannot be said to be so far removed from his job duties that they provided no benefit to the employer. Jones was performing tasks directly related to his job and at a time when he was required to do so, *i.e.*, he was on "company time." It could not credibly be asserted that Jones himself somehow obtained a benefit from violating the safety rules, because these rules are for his protection. Perhaps the result of not following safety regulations was that the work was able to be performed at a faster rate. Nothing in the record nor any argument from appellee even suggests that Jones benefited or was paid at a higher rate for performing his job at a quicker pace. It is clear from the evidence that the employer was the only one to benefit from the acts of the foreman. The trial court was correct in holding appellee vicariously liable for the acts of its foreman in regard to the violation of Ohio Adm. Code 3745-65-17(A). The employer has a duty to make sure that all safety rules are being enforced and cannot escape liability simply because a foreman sees fit not to enforce them. In this case the foreman was acting within the scope of his employment and hence the employer must be held liable.

Thus, for the reasons stated above I would reverse the decision of the court of appeals in its entirety and reinstate the judgment of the trial court.

SWEENEY, J., concurs in the foregoing opinion.

H. BROWN, J., concurring in part and dissenting in part. I concur in Parts I and III of the majority opinion. However, I must dissent from Part II.

Ohio has long adhered to the universally accepted rule that an employee's tortious act may fall within the scope of employment even though the employee acts in violation of the employer's directives. *Higbee Co.* v. *Jackson* (1920), 101 Ohio St. 75, 81, 128 N.E. 61, 64-65 (employer liable where employee permitted unauthorized passenger to ride in truck); see, also, Prosser & Keeton, Law of Torts (5 Ed. 1984) 502-503, Section 70 ("A master cannot escape liability merely by ordering his servant to act carefully. If he could, no doubt few employers would ever be held liable."). As Justice Resnick points out in Part II of her dissent, there was competent, credible evidence in the record to support a finding that Jones was within the scope of his employment when he caused the September 3, 1986 fire and explosion. Thus, under existing Ohio law, EEI should be held accountable under the doctrine of *respondeat superior.*

Nonetheless, the majority ignores both the substantive tort law articulated in *Higbee* and the standard of appellate review established in the syllabus of *C.E. Morris Co.* v. *Foley Constr. Co.* (1978), 54 Ohio St. 2d 279, 8 O.O. 3d 261, 376 N.E. 2d 578, and states, without elaboration, that the court below "was clearly within its authority to reverse the trial court" because "this case was tried to the court, and not a jury * * *." Just how a trial to the court rather than to a jury

justifies a deviation from the established law is left to the reader's imagination. Three possible interpretations can be considered.

First, the majority may have decided to partially abrogate the syllabus of *C.E. Morris* and create a new standard of appellate review in nonjury cases. However, neither the parties nor any court or commentator has (to my knowledge) expressed dissatisfaction with the *C.E. Morris* syllabus. If the majority is establishing a new standard of appellate review for nonjury trials, it should set forth that standard so that the bench and bar of this state will not be left guessing.

Second, the majority may have decided to create a new exception to the doctrine of *respondeat superior,* establishing as a matter of law that an employee is not in the scope of his or her employment where he or she has failed to comply with one of the employer's directives. If so, such a sweeping change in the law should be made explicit in the opinion and the syllabus.

Further, such a change in tort law is ill-advised. The rule which we articulated and applied in *Higbee* has been a universal feature of Anglo-American tort law since the Court of Exchequer Chamber decided *Limpus* v. *London General Omnibus Co.* (1862), 1 H. & C. 526, 158 Eng. Rep. 993. Employers — particularly corporations, which have no physical existence and can only act through their agents — would have no incentive to supervise employees and enforce socially desirable work rules if the bare existence of those rules were to be an absolute defense to *respondeat superior* liability. If the rule of *Higbee* is eliminated, then corporations doing business in Ohio will be virtually exempt from environmental regulation. Further, they will be all but immune from liability for most criminal or tortious acts. I hope that this is not what the majority intends.

Third, and most likely, the majority may feel that the one-thousand dollar civil penalty imposed for the violation of Ohio Adm. Code 3745-65-17(A) is too harsh on these particular facts, or even that Ohio Adm. Code 3745-65-17(A) is unwise. Accordingly, the majority may have decreed judgment to produce the desired result without concern for the legal rationale supporting it. I eschew such an approach.

The power to establish standards for the safe disposal of hazardous wastes — and civil penalties for the violation of those standards — rests with the Ohio EPA, pursuant to the delegation of legislative power by the General Assembly in R.C. 3745.01. It does not rest with this court. Nor do we exercise prosecutorial discretion. Our duty is to give effect to this legislation within the bounds of the Constitution.

Because I can discern no justifiable basis for exculpating a corporation for acts of a foreman performed within the scope of his employment, I must respectfully dissent from the majority's affirmance of the dismissal of Count XV against the appellees.