OPINION
{¶ 1} Appellant, the City of Willoughby Hills ("the City"), appeals from the decision of the Lake County Court of Common Pleas, Probate Division, where the probate court adopted the magistrate's recommendation to dismiss the City's petition for the appropriation of a temporary easement over Paul Andolsek's ("appellee") property. For the reasons that follow, we affirm the judgment of the probate court.
 {¶ 2} On June 17, 1999, appellant filed a petition for the appropriation of a temporary easement over a portion of appellee's property for a period not exceeding one year.[1] According to the petition, "[t]he purpose of appropriating the foregoing easement over [appellee's] real estate is for temporary access to and egress from a drainage project to be performed by the City of Willoughby Hills or its contractors." Attached to the petition was a resolution adopted by the City Council declaring the intent to appropriate the property, along with an ordinance directing such appropriation to proceed.
 {¶ 3} After filing a joint stipulation for leave, appellee filed an answer objecting to the appropriation petition. In general, appellee denied that: (1) appellant had the right to appropriate under the circumstances; (2) the parties were unable to agree on the value of the real estate to be appropriated; and (3) the appropriation was necessary because appellant had available to it other means of access to complete its drainage project.
 {¶ 4} Subsequently, on November 9 and 15, 2000, this matter proceeded to an evidentiary hearing before a magistrate. At the hearing, appellant presented the testimony of Richard Iafelice ("Mr. Iafelice") and Mayor O'Ryan, while Greg Alber ("Mr. Alber"), Terry Gerson ("Mr. Gerson") and Peter Pike ("Mr. Pike") testified on appellee's behalf. The following facts were adduced at the evidentiary hearing.[2]
 {¶ 5} Mr. Iafelice, the first vice-president with CT Consultants, a consulting engineering firm in Willoughby, Ohio, testified that CT Consultants was the city engineer for the City of Willoughby Hills. In 1996, Mr. Iafelice was contacted by several City Council representatives about a severe erosion problem in the rear yards of homes on the cul-de-sac of Sayle Drive. He was also made aware of the flooding problem to the south on Chardon Road. Believing that both of these problems were interrelated, Mr. Iafelice conducted a study to determine a feasible solution. After considering a series of alternatives, Mr. Iafelice proposed to correct the Sayle Drive erosion and the Chardon Road flooding problem by installing a storm sewer and dredging the retention basin pond, located in the back corner of sublot 18 on Sayle Drive.
 {¶ 6} To obtain access to this project site, Mr. Iafelice recommended that the City obtain a temporary 20-foot wide, 400 feet long easement across appellee's vacant lot. According to Mr. Iafelice, "this [temporary easement across appellee's property] provided the means, a safe means of access, based upon the fact that we have a public elect contract with the probable opinion of construction costs of $130,000.00, due to the nature of the construction, due to the nature of the vehicles and the amount of hauling of soil, spill materials, material handling, that this was the most safe and reliable way to effectively and cost effectively get the project done."
 {¶ 7} However, Mr. Iafelice conceded to the fact that it was feasible to complete the drainage project without obtaining a temporary easement over appellee's property, but at a much higher cost. According to Mr. Iafelice, he could not place a figure on this cost consideration:
 {¶ 8} "Q. We might as well cut right to the chase, Mr. Iafelice, can you build this project without the temporary access easement you seek to purchase from Mr. Andolsek?
 {¶ 9} "A. The project feasibly could be built, but at a much higher cost.
 {¶ 10} "Q. My question was, can you build the project?
 {¶ 11} "A. Yes.
 {¶ 12} "Q. So there is a cost consideration?
 {¶ 13} "A. Yes, there is a cost consideration.
 {¶ 14} "***
 {¶ 15} "A. The cost consideration could be significant.
 {¶ 16} "I can't put a dollar amount on it because I believed it to be unreliable, and nor would I recommend it to the City to do it."
 {¶ 17} Interestingly, during the hearing, it was revealed that the City already had a 20-foot easement between two sublots on Sayle Drive, which provided access to the retention basin pond:
 {¶ 18} "Q. *** There is an existing easement?
 {¶ 19} "A. [Mr. Iafelice] Yes.
 {¶ 20} "Q. From the end of Sayle Farm Drive to the retention basin?
 {¶ 21} "A. Yes
 {¶ 22} "Q. And how wide is that?
 {¶ 23} "A. 20 feet.
 {¶ 24} "Q. The same width as the Andolsek easement?
 {¶ 25} "A. Yes."
 {¶ 26} That existing easement was established "to lay maintain, repair, or remove storm sewers, manholes, inlets, drainage swales and any other necessary drainage appurtenances[,]" when the Sayle Drive Development was built. However, this easement was located between two residential homes, to wit: sublots 18 and 19. According to Mr. Iafelice, the distance between the houses located at sublots 18 and 19 was only 30 feet, while the width of the existing easement was 20 feet wide. As a result of the proximity of the existing easement to the residential homes, Mr. Iafelice believed there was a risk of damage to these houses if the existing easement was used to access the project site:
 {¶ 27} "Q. Okay. What risks does it present to the homes and the underground piping?
 {¶ 28} "A. *** [T]he forces from the heavy loads, the forces upon the earth and the lateral forces that would go against the foundation of the home, that's one thing that is forced, and then there is vibration itself."
 {¶ 29} Mr. Iafelice further opined that such vibration presented a risk of cracks developing in the foundations of the homes. Given that there were cost and safety concerns in utilizing the existing easement to access the project site, Mr. Iafelice explained that he would not recommend using this route:
 {¶ 30} "*** The ability to traverse this [existing easement] with construction vehicles that is needed to build this project in my opinion, could cause harm to the adjacent properties because of their close proximity [to the existing easement].
 {¶ 31} "***
 {¶ 32} "I wouldn't even propose it because I don't believe it to be safe, and it is unreliable.
 {¶ 33} "The potential exists, in my mind, for vibration and damage to the adjacent foundation that will also damage the storm sewer.
 {¶ 34} "In addition, we will have to negotiate and build temporary roads across the rear yards, and probably crush the septic systems in the rear yards of these homes as well."
 {¶ 35} Furthermore, Mr. Iafelice anticipated that the travel of heavy construction vehicles would cause more damage to the secondary road of Sayle Drive than to Chardon Road. Thus, Mr. Iafelice opined that the best point of access for the construction project was from Chardon Road through appellee's property. Mr. Iafelice, however, indicated that the City would utilize the existing easement "if it was safe and reliable, we would certainly recommend doing it, if we could get this project done."
 {¶ 36} In contrast, Mr. Gerson, a consulting engineer and owner of William Gray and Associates in Mentor, Ohio, testified that the City did not need to obtain the temporary easement over appellee's property to construct the drainage project; rather, the City could utilize the existing easement:
 {¶ 37} "Q. Okay. In your opinion, in your professional opinion, and based upon your experience as an engineer, does the City need the Andolsek access easement in order to construct this project?
 {¶ 38} "A. No, I don't believe they do."
 {¶ 39} Mr. Gerson further explained that the area where the temporary access easement was to be located on appellee's property "has been filled." As a result, Mr. Gerson opined that "this fill area would be very unsuitable for the bearing of trucks. So there would have to be some extra area measures, photographs [sic] devoted to maintaining truck traffic through that easement."
 {¶ 40} As for damage to Sayle Drive resulting from the travel of heavy construction vehicles accessing the existing easement, Mr. Gerson suggested that load limits could be imposed to protect the residential streets. For instance, the delivery of the material could be made in smaller quantities. This, however, would increase the number of trips to be made by the construction vehicles.
 {¶ 41} Mr. Gerson also conceded to the fact that the temporary easement over appellee's property provided a direct route of access from Chardon Road to the project site. But rather than utilize appellee's property, Mr. Gerson suggested that "the most logical [solution] would be to acquire an easement from the owner of sublot 18[,]" presumably because the retention basin pond was located in the back corner of this sublot.
 {¶ 42} Likewise, Mr. Alber, a registered engineer with a consulting firm and participant in the family excavating business, testified that the drainage project could be completed by utilizing either the temporary easement over appellee's property or the existing easement:
 {¶ 43} "Q. *** In your opinion, is either means of access preferred over the other?
 {¶ 44} "A. That is a tough question. The direct access off of Sayle Farm Drive is certainly preferable as far as construction sequence goes.
 {¶ 45} "The other access easement is more open, if you will, on an undeveloped lot and you, as a contractor, like to work kind of on your own away from other people.
 {¶ 46} "So in that regard, that access easement is more desirable from that standpoint.
 {¶ 47} "Q. But you have already testified you could utilize either one?
 {¶ 48} "A. Yes."
 {¶ 49} Furthermore, if access through appellee's property was unavailable, Mr. Alber believed that the project site could still be reached by using the existing easement between sublots 18 and 19. Mr. Alber also explained that he would not be concerned about damage to the residential homes if the existing easement were used:
 {¶ 50} "Q. Explain for the Court why you would be concerned about, you mentioned increased loads on basement walls.
 {¶ 51} "A. If the basement was situated, that it was within, say the basement is 10 foot deep, if the basement edge or wall was within say, 20 feet of the easement, then it would experience loads onto the walls from the heavy trucks, in terms of a surcharge.
 {¶ 52} "Being that it is a slab on grade type construction, there is no wall. Therefore, I wouldn't be as concerned about cracking a basement wall, or any type of damage like that.
 {¶ 53} "Q. Based on your walk of the site, then, would be you concerned about any damage to the existing residences, as a result of accessing this is project off of Sayle Farm Drive?
 {¶ 54} "A. As far as the structural house, no.
 {¶ 55} "Obviously, the landscaping and if you were to use the driveway, I think there you could see some minor damage there that would need to be repaired.
 {¶ 56} "Q. What about the septic tanks, do you consider that to be a concern, no matter where they are?
 {¶ 57} "A. The septic tanks are a concern, sure.
 {¶ 58} "Obviously, you don't want to drive directly over the tank.
 {¶ 59} "I did not see the tanks in that easement. I doubt that this, whoever permitted those to be installed, would allow the tank to be put in the easement.
 {¶ 60} "The tank could be plated. It is still kind of risky.
 {¶ 61} "As far as the leach fielding, those can be protected pretty easily. I also doubt that you would cross right at the front of the leach field where it ties into the tank.
 {¶ 62} "It would be more towards the end of the leach field. And if there was damage, it is pretty simple to repair."
 {¶ 63} As for the negotiations between the city and appellee, Mr. Iafelice testified that he personally negotiated with Mr. Joseph Weiss ("Mr. Weiss"), appellee's attorney, in the presence of Mayor O'Ryan. According to Mr. Iafelice, he met with appellee, his attorney, and the Mayor to discuss the construction project as well as the temporary easement. At this meeting, Mr. Iafelice presented a standard donation form letter to appellee if he was inclined to donate the temporary easement to the City, along with an estimate valuation of a temporary easement, "to begin negotiation proceedings."
 {¶ 64} In determining the estimate valuation of the temporary easement over appellee's property, Mr. Iafelice explained that he did not obtain an appraisal of the easement to determine its fair market value. Rather, Mr. Iafelice determined the valuation of the temporary easement by going to the Lake County Recorder's Office and looking up the county auditor's land appraisal from 1994, which valued the property at $37,250. Mr. Iafelice proceeded to adjust this figure to $80,000, and then took 10 percent of that amount and adjusted that sum because it was an easement and came up with a value of $1,600:
 {¶ 65} "Through the calculation, we typically have, and the standard of practice in our industry, put a value of 10 percent of the worth of the property since it is not a permanent easement, as a temporary easement, and that that calculation comes in for the land 20 foot wide by 400 feet deep, comes out to about $1,600.00."
 {¶ 66} In contrast to Mr. Iafelice's testimony, Mayor O'Ryan stated that he had only one personal meeting with appellee. Other than this one meeting, Mayor O'Ryan was uncertain as to whether there were additional meetings with appellee.
 {¶ 67} As to this one meeting, Mayor O'Ryan testified that he might have asked appellee to donate the easement to the City. The Mayor, however, did not advise appellee that the City was willing to compensate him for the temporary easement because, according to Mayor O'Ryan, appellee would not grant an easement:
 {¶ 68} "Q. Okay. Did you ever indicate to him [appellee] that the price for the easement was negotiable?
 {¶ 69} "A. No, we never got that far. He [appellee] shocked me so much because as soon as I brought up the word easement, he said, `I no give easement', and got up and walked out. ***
 {¶ 70} "Q. So if I understand your testimony, you didn't tell him
[appellee] what you would pay him for it [the easement], you didn't tellhim where it would be?
 {¶ 71} "A. Correct." (Emphasis added.)
 {¶ 72} Some time thereafter, Mayor O'Ryan received a copy of a correspondence sent by the City to appellee's attorney, Mr. Weiss, which confirmed that in light of the previous discussions, appellee was unwilling to grant an easement on his property.
 {¶ 73} Mayor O'Ryan also clarified that typically, the law director and city engineer handled negotiations to purchase an easement on behalf of the City. The Mayor, however, was unsure if the law director contacted appellee with regard to this easement. In spite of that fact, Mayor O'Ryan confirmed that he consulted with the city engineer and law director as to the drainage project.
 {¶ 74} Finally, Mr. Pike, a councilman at large and council president of the Willoughby Hills City Council, testified that he was unable to recall whether he voted in favor of appropriating the temporary easement over appellee's property. Despite that fact, Mr. Pike was in favor of accessing the project site by utilizing appellee's property because, according to him, it made "common sense":
 {¶ 75} "*** But common sense were to tell you that to bring equipment in with the side yards because you are sitting on a cul-de-sac as opposed to open, barren land, that you have the same access to without any disturbance, that's kind of just basic common sense, I think.
 {¶ 76} "My young daughter would be able to figure that out."
 {¶ 77} Mr. Pike also gave his opinion that the existing easement was not meant to be used as an access route for the construction project.
 {¶ 78} Upon consideration of the foregoing, the magistrate issued her recommendation on February 7, 2001, dismissing appellant's petition for appropriation of a temporary easement over appellee's property. According to the magistrate's decision, appellant had abused its discretion in determining that the temporary easement was necessary and had failed to negotiate with appellee in making the appropriation. Thus, the magistrate recommended that the probate court find in favor of appellee on the basis that there was no necessity for the temporary easement, and that appellant did not negotiate with appellee pursuant to R.C. 163.04.
 {¶ 79} Afterwards, this matter came before the probate court on appellant's objections to the magistrate's decision. Upon considering appellant's supporting arguments, the probate court adopted the magistrate's decision, reasoning that appellee "ha[d] met his burden in showing that the City abused its discretion in determining the necessity of [the temporary] easement and in its negotiations with him." Thus, in a judgment entry dated April 30, 2001, the probate court dismissed appellant's petition for appropriation.
 {¶ 80} Appellant subsequently filed a notice of appeal on May 25, 2001. Although the probate court ruled in favor of appellee, the court failed to address the issues of attorney fees or costs as required by R.C. 163.21 and 163.62. As a result, this court remanded the matter to the probate court on July 13, 2001, with instructions to consider attorney fees and costs in its judgment.
 {¶ 81} On remand, the probate court complied with this court's directive by issuing the September 5 and 19, 2001 judgment entries, which ordered appellant to pay appellee's attorney fees totaling $23,319.50. This judgment, however, was stayed pending the outcome of this appeal.
 {¶ 82} It is from this final judgment appellant appeals, submitting two assignments of error for our consideration:
 {¶ 83} "[1.] The trial court erred by dismissing the appellant's complaint for appropriation.
 {¶ 84} "[2.] The trial court erred by awarding attorney fees in a case wherein the appropriating authority has the right to appropriate, and the case is not abandoned."
 {¶ 85} This court approaches a judicial determination overruling a local legislative entity's eminent domain necessity decision with a healthy suspicion. We are well aware that "`[t]he decision of a legislative body to appropriate a particular property is afforded great deference by courts because it is presumed that the legislative body is familiar with local conditions and best knows community needs.'" Mentorv. Osborne (2001), 143 Ohio App.3d 439, 445. For that reason, "the statement of necessity within an appropriation petition is prima facie evidence of such necessity in the absence of proof showing an abuse of discretion by the agency." Id. In the lower court proceedings, "the probate court, in resolving issues raised in an appropriation proceeding `must defer to legislative wisdom as to discretionary matters[,]' *** and is limited to determining whether or not the appropriating agency acted fraudulently, in bad faith, or abused its discretion." (Citations omitted.) Id. at 446.
 {¶ 86} However, deference to the legislative body does not mean blind acceptance of a legislative appropriation decision.
 {¶ 87} This court is equally aware of the protective nature of individual property rights as demonstrated by Section 1, Article I[3]
and Section 19, Article I[4] of the Ohio Constitution. These constitutional property rights dictate that a property owner may challenge a local eminent domain action. However, when, as in this case, the appropriating agency has adopted a resolution of necessity, the property owner (i.e., appellee) has the burden of establishing that there is no necessity. Osbourne at 446.
{¶ 88} In this case, appellee maintains that there is no public necessity to take a 20-feet-wide temporary easement over his property for access to a drainage basin because appellant already has an existing 20-feet-wide permanent easement over other property for that purpose, and appellant has failed to establish the necessity for taking appellee's property instead of using the existing permanent easement.
{¶ 89} Appellant counters by citing to its engineer's conclusory testimony that use of the existing easement will cost more (but the engineer failed to support this conclusion with any documented financial evidence), and that there is a risk of damage to houses near the existing easement area. Appellant also repeatedly cites to some gratuitous hearsay testimony from a city councilman concerning his unidentified "young daughter" and her alleged perception as to site access in this case.[5]
{¶ 90} First, appellant maintains that the evidence presented at the evidentiary hearing failed to support the probate court's finding that the city abused its discretion in determining the necessity of the temporary easement. According to appellant, the temporary easement over appellee's property is necessary because "no other access point is sufficient with regard to safety and cost, and it is inherently reasonable to access the proposed work site over the appellee's vacant land." Appellant further claims that the decision of the City Council was based upon advice and information provided by the City's engineer.
{¶ 91} The preceding argument is essentially a weight of the evidence question. As such, we note that it is well-established that "[j]udgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence." C.E. MorrisCo. v. Foley Constr. Co. (1978), 54 Ohio St.2d 279, syllabus. See, also, Osborne at 447-448.
{¶ 92} The issue of necessity involves our limited standard of review. "As the trier of fact is in the best position to view the witnesses and their demeanor, in making a determination that a judgment is against the manifest weight of the evidence, this court is mindful that we must indulge every reasonable presumption in favor of the lower court's judgment and findings of fact." Osborne at 448. It follows that "an appellate court may not simply substitute its judgment for that of the trial court so long as there is some competent, credible evidence to support the lower court's findings." State ex rel Celebrezze v.Environmental Ent., Inc. (1990), 53 Ohio St.3d 147, 154. See, also, Osborne at 448.
{¶ 93} With the foregoing legal principles in mind, we review the testimony presented at the evidentiary hearing and the exhibits submitted into evidence to determine whether the probate court's conclusion that the City abused its discretion in determining that the appropriation was necessary is supported by competent, credible evidence. Osborne at 447-448.
{¶ 94} During his testimony, Mr. Iafelice, the City's engineer, stated that he would not recommend constructing the proposed drainage improvement if access to the project site could not be obtained by using appellee's property. Nevertheless, Mr. Iafelice admitted it was feasible to complete the drainage project without obtaining a temporary easement over appellee's property, but at a higher cost. Mr. Iafelice, however, was unable to provide a figure as to this cost consideration. In fact, the City proffered no financial evidence supporting its "higher cost" assertion. While Mr. Iafelice explained that there would be safety and cost concerns if the existing easement was used to access the project site, he indicated that the City would be willing to utilize the existing easement "if it was safe and reliable ***."
{¶ 95} While Mr. Iafelice's testimony has some evidentiary merit, his testimony was mostly conclusory in nature and was supported by a paucity of engineering data, financial information or other detailed factual evidence. Such conclusory testimony may be acceptable in the legislative arena, but it is not sufficient in this case to respond to the evidence proffered by appellee in pursuing appellee's burden of establishing a lack of public necessity in this case.
{¶ 96} Mr. Gerson testified, on behalf of appellee, that the City did not need to obtain a temporary access easement over appellee's property to construct the drainage project. Rather, the existing easement could be the access route to the project site. As for damage to Sayle Drive resulting from the travel of heavy construction vehicles accessing the existing easement, Mr. Gerson testified that load limits could be imposed to protect the residential streets. Mr. Gerson further proposed a third alternative to access the drainage project site. According to him, rather than utilize appellee's property, "the most logical [solution] would be to acquire an easement from the owner of sublot 18[,]" presumably because the retention basin pond was located in the back corner of this sublot.
{¶ 97} Likewise, Mr. Alber opined that either a temporary easement over appellee's property or the existing easement could be used to reach the project site. Additionally, Mr. Gerson and Mr. Alber testified as to precautions that could be taken to prevent damage to the residential homes if the existing easement was used.
{¶ 98} The testimony regarding the use of the existing easement weighs heavily on this issue. The very fact that the City has a previously accepted permanent, pre-existing easement for drainage purposes is a critical factor. There is sufficient evidence in the record submitted by appellee to conclude that appellee met its burden and to support the trial court's ruling.
{¶ 99} Appellant's apparent rebuttal argument was predicated on its assertions that cost and safety considerations dictated nonuse of the existing easement and the taking of a temporary easement over appellee's property. Unfortunately for the City, appellant presented little factual evidence to support these assertions.
{¶ 100} The City failed to provide any cost analysis or financial evidence that would support its alleged "necessity" in acquiring appellee's property based on cost considerations. There also was credible, unrebutted testimony that the City could use the existing easement with some viable modifications, without creating any unwarranted, unsafe condition. Furthermore, the City gave no indication and presented no rebutting evidence that it even considered the third option of acquiring an easement from the owner of sub lot 18. Thus, the competent, credible evidence presented supports the abuse of discretion ruling by the probate court. Under the unique circumstances in this case and based on the evidence appearing in the record, appellee met his burden that the City abused its discretion.
{¶ 101} Finally, the importance placed on an individual's property rights is well manifested in the Ohio Constitution. Under Section 1, Article I, Ohio Constitution "[a]ll men *** have certain inalienable rights *** among which are those of *** acquiring, possessing and protecting property ***." An overriding public necessity is a very limited exception to the constitutional concept that "[p]rivate property shall ever be held inviolate." Section 19, Article I, Ohio Constitution. When, as in this case, the condemning authority can still satisfy the public interest (albeit somewhat less conveniently)[6] without depriving a landowner of his or her "inviolate" property rights, the constitutionally protected rights of the landowner must prevail.
{¶ 102} For the reasons stated, the probate court did not err in this case in determining that there was a lack of necessity in seeking a temporary easement by means of appropriation. Appellant's first issue in the first assignment of error is without merit.
{¶ 103} Under the second issue presented in the first assignment of error, appellant challenges the probate court's determination that the City abused its discretion by failing to engage in good faith negotiations with appellee. According to appellant, the probate court ignored a correspondence from the City to appellee's attorney confirming that Mr. Andolsek was unwilling to negotiate with the City even though he was offered $1,500 as compensation for the temporary easement.[7] From this, appellant concludes that the City had attempted to negotiate with appellee, and that it was appellee who refused to negotiate.
{¶ 104} Likewise, in the third issue submitted under the first assignment of error, appellant claims that the probate court misapplied R.C. 163.59 by holding that an appraisal was mandated prior to negotiations. According to appellant, "[w]hen acquiring a temporary access easement of a relatively small portion of an undeveloped parcel, a full appraisal obtained prior to negations simply is not `practicable.'" (Emphasis ommitted.) Appellant suggests all that is required under R.C. 163.04 is that the parties were "`unable to agree, for any reason ***.'"
{¶ 105} In light of our determination on the first issue in the first assignment of error that the probate court properly dismissed the City's appropriation petition based on the lack of necessity, the issues concerning appraisal and the negotiations among the parties are moot.
{¶ 106} Nevertheless, we would note that R.C. 163.59 sets forth the policies governing public land acquisitions and reads as follows:
{¶ 107} "In order to encourage and expedite the acquisition of real property by agreements with owners, to avoid litigation and relieve congestion in the courts, to assure consistent treatment for owners in the many state and federally assisted programs, and to promote public confidence in public land acquisition practices, heads of acquiringagencies shall, to the greatest extent practicable, be guided by thefollowing policies:
{¶ 108} "***
{¶ 109} "(B) Real property shall be appraised before the initiationof negotiations, and the owner or his designated representative shall be given an opportunity to accompany the appraiser during his inspection of the property, except that the head of the lead agency may prescribe a procedure to waive the appraisal in cases involving the acquisition by sale or donation of property with a low fair market value. ***
{¶ 110} "(C) Before the initiation of negotiations for realproperty, the head of the acquiring agency concerned shall establish an amount which he believes to be just compensation therefor and shall make a prompt offer to acquire the property for the full amount so established. In no event shall such amount be less than the agency's approved appraisal of the fair market value of such property. ***"[8]
(Emphasis added.)
{¶ 111} In the instant matter, the City did not attempt to obtain an appraisal of the temporary easement prior to initiating negotiations with appellee. Rather, Mr. Iafelice examined the county auditor's land appraisal from 1994, which valued appellee's property at $37,250, arbitrarily doubled that figure, then took 10 percent of that amount and adjusted that sum because it was an easement to come up with a value of $1,600. Under these circumstances, the probate court did not err in determining that appellant's negotiation with appellee was an abuse of discretion.
{¶ 112} In assignment of error two, appellant argues that the probate court erred in ordering the City to pay appellee's attorney's fees. According to appellant, the dismissal of the City's petition was erroneous, therefore, the probate court subsequently erred in awarding appellee his attorney's fees.
{¶ 113} Given our disposition in the first assignment of error that the probate court properly dismissed the City's appropriation petition, the court had the authority under R.C. 163.21 to award appellee his attorney's fees. As such, the second assignment of error is not well taken.
{¶ 114} Based on the foregoing analysis, appellant's first and second assignments of error are without merit. The judgment of the probate court is affirmed.
WILLIAM M. O'NEILL, P.J., and DONALD R. FORD, J., concur.
[1] Appellee's wife, Mary Andolsek, died prior to the institution of this action. As such, she is not a party to this action or this appeal.
[2] We note that although Mr. Adolsek testified at the hearing, his testimony was not recorded. Thus, Mr. Adolsek's testimony is unavailable for purposes of appellate review.
[3] "All men are, by nature, free and independent, and have certain inalienable rights, among which are those of enjoying and defending life and liberty, acquiring, possessing, and protecting property, and seeking and obtaining happiness and safety." Section 1, Article I, Ohio Constitution.
[4] "Private property shall ever be held inviolate, but subservient of the public welfare. When taken in time of immediate seizure or for the purpose of making or repairing roads, which shall be open to the public, without charge, a compensation shall be made to the owner, in money, and in all other cases, where private property shall be taken for public use, a compensation therefor shall first be made in money, or first secured by a deposit of money, and such compensation shall be assessed by a jury, without deduction for benefits to any property of the owner." Section 19, Article I, Ohio Constitution.
[5] The City's constant (but misplaced) citation to Councilman Pike's testimony about his "young daughter" is most perplexing. Councilman Pike's daughter obviously is not an engineering expert and was not a witness. The city would have been better served by proffering factual evidence supporting its alleged safety concerns and claimed additional costs, rather than relying on such non-evidence.
[6] It would belie the public's confidence if the necessity element in an appropriation proceeding could be satisfied by merely showing that the appropriation was "convenient" for the appropriating agency.
[7] In contrast, at the hearing Mr. Iafelice testified that the City offered appellee $1,600.
[8] R.C. 163.59 was recently amended on September 6, 2002. "[A]bsent a clear pronouncement by the General Assembly that a statute is to be applied retrospectively, a statute may be applied prospectively only."State v. LaSalle, 96 Ohio St.3d 178, 2002-Ohio-4009, at ¶ 14. Given that there is no language in the amended R.C. 163.59 that the statute is to be applied retrospectively, it is presumed to be prospective in its operation. Accordingly, this court will consider the version of R.C. 163.59
in effect at the time the City filed its petition.