[Cite as *McNaughton v. Cochenour*, 2015-Ohio-4648.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
ROSS COUNTY

| | | |
|---|---|---|
| JOAN (JONI) K. MCNAUGHTON | : | Case No. 15CA3479 |
| Petitioner-Appellee, | : | |
| v. | : | <u>DECISION AND</u> <u>JUDGMENT ENTRY</u> |
| JAMES (RUSTY) R. COCHENOUR | : | |
| Respondent-Appellant. | : | **RELEASED: 11/9/2015** |

<u>APPEARANCES</u>:

Joseph H. Nemec and Claire M. Ball, Jr., Athens, Ohio, for appellant.

Joan K. McNaughton, pro se appellee.

Harsha, J.

**{¶1}** Joan "Joni" McNaughton obtained a civil stalking protection order against James "Rusty" Cochenour after a series of incidents that occurred in June and July 2014. In his appeal Cochenour argues that the trial court abused its discretion when it found that he acted knowingly when he caused McNaughton mental distress. However, the record contains evidence that Cochenour sent McNaughton a bizarre letter at her employer's place of business, and after being told by police not to contact her 1) sent her another letter at home and 2) erected a large roadside sign addressed to her near her home. Based upon the evidence that he was instructed not to harass McNaughton because it made her fearful, yet he persisted, a reasonable fact-finder could conclude that Cochenour acted with knowledge that his conduct would cause McNaughton mental distress. McNaughton's testimony supports the finding that she suffered mental

distress as a result of Cochenour's letter to her employer, and his increasingly bizarre behavior after being instructed by police not harass or contact McNaughton.

{¶2}   Cochenour also claims the trial court abused its discretion in finding that McNaughton actually suffered mental distress.  However, her testimony is replete with complaints of emotional distress, fear, anxiety and concern for her safety. There is ample evidence to support the conclusion that McNaughton suffered mental distress as a result of Cochenour's persistent and unwelcome, bizarre behavior. Therefore, we affirm the trial court's judgment.

## I. FACTS

{¶3}   McNaughton and Cochenour were married for approximately 14 years. They divorced in 2010 after a two-year separation period, but since their divorce the parties have had intermittent contact.  McNaughton testified that Cochenour sent occasional cards or letters and photographs of himself or pictures of things he wrote in the snow such as hearts with "Rusty loves Joni" or "I love you." She testified that she tried to be civil and would sometimes open his mail, but did not keep it.  However, she did not believe there was "a problem" until recently.

{¶4}   Cochenour testified that the parties would exchange occasional cards or gifts but that McNaughton changed her phone number about a year ago and would not give him her new phone number. Although he could no longer contact her by her personal telephone, he continued to contact her by mail or by phone at her workplace. He testified that years earlier he was told by McNaughton's employer not to come to her workplace, a hardware store, because his presence made the employer uncomfortable.

{¶5}   In late June through July 2014, a series of incidents caused McNaughton to believe "a problem" had developed.  She testified that she believed Cochenour had become "unstable," "threatening" and in need of "mental help." The first incident occurred in late June 2014. McNaughton was working at the hardware store, which was giving away root beer floats to customers. During a local radio station broadcast, a radio reporter asked McNaughton what she thought of the floats.  She said "They are great" and went on about her job.  Cochenour heard McNaughton on the radio and called the hardware store. McNaughton testified that he stated that he had heard her on the radio and wanted to know, "Are you giving out autographs?"  She was unable to recognize his voice at first due to background noise, but then when the caller stated, "Oh, I would love to come and see you, I, I don't drink root beer, but I would love to come and see you" she recognized the caller as Cochenour and ended the conversation.

{¶6}   Approximately six days later Cochenour sent an anonymous letter addressed to McNaughton's employer.  The letter purported to be from a law firm and was addressed to the proprietors of the hardware store.  The first two paragraphs stated:

> This letter is a formal notice of a possible trademark violation occurring during a live radio broadcast from your store on 28June14.  This possible trademark violation was uttered on *WKKJ 94.3*. Said radio station is not only a local station but also a member of *I heart radio*. As such, membership allows these broadcasts to be heard around the world by possibly billions of people if they are so inclined. Thus the seriousness of the ramification of the possible trademark violation.

> The said possible trademark violation was uttered by your radio representative *Joni*. The local radio reporter *Dan Ramey* was reporting on your distribution of free root beer floats.  When he asked said Joni how the floats were she stated, "They're great". This is the possible trademark violation. (Emphasis in original)

{¶7} The letter went on to explain the possible product confusion that might exist between Kellogg's Frosted Flakes and the root beer floats as a result of the radio broadcast. It stated that the law firm had performed a background check on McNaughton and "found another disturbing attempted violation of a trademarked personality" and that one of the store's proprietors "could be implicated as an accessory to the crime." It referred to pictures on the hardware store's Facebook page involving the M & M mascot and a kidnapping attempt of the mascot. The letter accused McNaughton of possible criminal intent and told the employer to "do better background checks on the representatives for your company."

{¶8} Finally, the letter concluded with three paragraphs offering to resolve the purported trademark violation and contained a typewritten signature block, "Attorneys Sweet, Good & Ness":

> After much consideration *Tony the Tiger* decided perhaps your representative *Joni* may have either A) been forced to utter "they're great" through threat of physical harm, or B) be poorly paid to represent an inferior product.
>
> With these considerations in mind *Tony the Tiger* may negotiate a reduced penalty for the possible trademark violation. If you feel like you want to contest this charge of a possible trademark violation you may face the full penalty under the law.
>
> If you decide to negotiate a reduced penalty we will put you in contact with one of our local associates. You, Bill and Madeline, will be required to bring your representative Joni to a meeting with our local associate. Please respond promptly to avoid missing out on *Tony the Tiger's* generous offer. Remember *Tony the Tiger* is a real tiger not just a poorly paid imposter such as your *Joni* perhaps is. Real tigers can be very vicious when provoked! To arrange a meeting please call * * *. (Emphasis in original)

{¶9} McNaughton testified that her employer read the letter and asked her if she recognized the telephone number listed. She responded it was the phone number she had when she was married and lived with Cochenour. She testified that both she

and her employer were upset and disturbed by the letter and both found the reference to real tigers being vicious when provoked to be a threat. They both interpreted the letter as trying to "downgrade" her in the eyes of her employer and as threatening. The employer was sufficiently alarmed that he called the police and filed a report.

{¶10} The police report shows that the police were dispatched to the hardware store on July 3, 2014. It states that an officer would advise Cochenour to stop calling and writing to McNaughton and to stop harassing her at work:

> She said her ex-husband is Rusty Cochenour and sometimes will leave mail (mostly junk mail) on her car and call her from time to time. She said she wants him to stop calling her, she wants no more letters from him and wants him to not harass her at work. Ofc. advised her Ofc. would contact him and advise him of this. Ofc. advised William [employer] Ofc. would also advise him not to call the business and that he is barred from there.

Thus, McNaughton asked the police to instruct Cochenour to stop calling her or writing her and believed that "he was told basically to leave me alone." Cochenour testified that a police officer did call him as indicated in the report and told him not to bother McNaughton, but that he understood the officer to mean that he was not supposed to bother McNaughton at work. He claims that he believed he could continue to contact her at her home and elsewhere.

{¶11} Thus Cochenour had knowledge that he caused sufficient alarm to McNaughton and her employer to cause them to contact the police. And although he had been notified by the police to stop contacting McNaughton, about three weeks later, Cochenour erected a 3 ½ foot by 2 foot large sign that said, "Happy Birthday Joni. I love you." He placed this sign along the roadway about 1 mile from McNaughton's residence. He also wrote her a letter dated July 24, 2014 that explained he intended the "Tiger"

letter to her employer alleging trademark violations to be humorous and a light-hearted

offer to reconcile their former romantic relationship:

> My purpose for that letter was to break the ice and have Bill and Madeline chaperone us for dinner. I love you Joni and want to spend time with you. I want you to love me.

{¶12} McNaughton testified that when she saw the sign and received the letter

knowing that Cochenour had been informed by the police that he was to have no further

contact her, she was "upset" and "very uncomfortable that he would come that close to

my home." She contacted the Ross County Sheriff as well as the Chillicothe police and

reported Cochenour's behavior. The police report states:

> [McNaughton] lives alone and is in fear that James [Cochenour] may do something as his actions are becoming more frequent and bizarre. This unit advised Joni to obtain any report she has filed and to consult the court in reference to a CPO or Civil stalking protection order. Joni also advised that since they have been divorced, James [Cochenour] sends pictures of himself to her. Joni advised that they are of him after he has competed in races. Joni advised that she thought if she ignored him that he would just go away. Joni advised that she is stressed as she does wonder what he may or may not do to her. Joni advised that she would start the process of a CPO and would also make other reports, should the activity continue.

{¶13} McNaughton testified, "there was nothing about the letter that was sent to

my work place that was funny. It was disturbing. It was twisted. Anybody * * * that has

read that letter, feels exactly the same way that I do, that it is disturbing and it's

threatening." As a result of the series of incidents in June and July 2014, McNaughten

testified that she believed Cochenour is unstable, threatening and in need of mental

help.

{¶14} Cochenour admitted to sending the letters and erecting the sign. He

admitted that he intended for the letter to cause McNaughten's employer to contact him

as directed in the letter to resolve the trademark violation claim, though his secret plan

was to invite everyone to dinner:

> I asked for Bill or Madelyn to contact me, I put my phone number in there.  * * * I
> was teasing with the, the attorney name, but my actual phone number was in
> there for them to call me because I wanted them to contact me so that I could
> offer a supper as the penalty of this trademark violation.

{¶15}  He believed having McNaughten's employers serve as chaperones at a

dinner would make McNaughten more likely to have dinner with him because he did not

believe that McNaughten would agree to be alone with him. Cochenour also conceded

that perhaps he should not have included the sentence in the letter "Remember, *Tony*

*the Tiger* is a real tiger . . . Real tigers can be very vicious when provoked!"  However,

he claimed he did not believe that the employer would take it as a threat:

> Maybe that paragraph about being real, real tiger being vicious when provoked,
> maybe I should have left that out  * * * I know [the employer] is sometimes drawn
> as a cartoon in his ads, but I didn't think he would take that as a threat.

{¶16}  McNaughton filed a petition for a civil stalking protection order under R.C.

2903.211 and attached the July 3, 2014 police report, the letter from Cochenour to

McNaughton's employer asserting trademark violations, the July 27, 2014 police report,

and the July 24, 2014 letter from Cochenour to McNaughton. After the trial court issued

a 30-day ex parte civil stalking protection order, the case was submitted to a magistrate.

Both Cochenour and McNaughton appeared without counsel at the hearing. The

magistrate issued a decision recommending the issuance of a civil stalking protection

order against Cochenour under the same terms and conditions imposed in the ex parte

order. Cochenour retained counsel who ultimately filed objections to the decision on the

grounds that there was no evidence to support a finding that Cochenour acted

knowingly, and no evidence of threats of harm or that McNaughton suffered mental

distress. However, the trial court agreed with the magistrate's decision that Cochenour had engaged in menacing by stalking as defined by R.C. 2903.211(A)(1). It granted McNaughton a civil stalking protection order against Cochenour for a period of five years and ordered him not to enter McNaughton's residence or place of employment, not to initiate contact and to stay 100 yards away from her. Cochenour appealed.

## II. ASSIGNMENTS OF ERROR

Cochenour assigns the following errors for our review:

I. The trial court abused its discretion in concluding that Appellant acted with the intent required to justify issuance of a Civil Stalking Protection Order.

II. The trial court Abused its Discretion in Concluding that Appellant's Action Caused Appellee "Mental Distress."

## III. LAW AND ANALYSIS

### A. Standard of Review

{¶17} Because the decision on whether to grant a civil protection order is within the trial court's sound discretion, we will not reverse it absent an abuse of that discretion. *McKinley v. Kuhn*, 4th Dist. Hocking App. No. 10CA5, 2011-Ohio-134, ¶¶ 12-13; *Smith v. Wunsch,* 162 Ohio App.3d 21, 2005-Ohio-3498, 832 N.E.2d 757, at ¶ 10 (4th Dist.). "The term 'abuse of discretion' * * * implies that the court's attitude is unreasonable, arbitrary or unconscionable." *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983). A trial court abuses its discretion when it has taken "a view or action that no conscientious judge could honestly have taken. " *State v. Brady*, 119 Ohio St.3d 375, 2008-Ohio-4493, 894 N.E.2d 671, ¶ 23. To establish an abuse of discretion "the result must be so palpably and grossly violative of fact or logic that it evidences not the exercise of will but the perversity of will, not the exercise of judgment

but the defiance of judgment, not the exercise of reason, but instead passion or bias."
*Smith v. Wunsch*, 162 Ohio App.3d 21, 26, 2005-Ohio-3498, 832 N.E.2d 757, 761, ¶ 10
(4th Dist.) citing *Vaught v. Cleveland Clinic Found.,* 98 Ohio St.3d 485, 2003-Ohio-2181,
787 N.E.2d 631, ¶ 13; *Nakoff v. Fairview Gen. Hosp.*, 75 Ohio St.3d 254, 256, 662
N.E.2d 1 (1996).

{¶18}  Moreover, an "appellate court may not simply substitute its judgment for
that of the trial court so long as there is some competent, credible evidence to support
the lower court findings." *State ex rel. Celebrezze v. Environmental Enterprises, Inc.*, 53
Ohio St.3d 147, 154, 559 N.E.2d 1335 (1990). When an appellate court reviews a trial
court's judgment, it must generally defer to the fact-finder's weight of the evidence and
credibility determinations. *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 81,
461 N.E.2d 1273 (1984). As the Court explained in *Seasons Coal:*

> A reviewing court should not reverse a decision simply because it
> holds a different opinion concerning the credibility of the witnesses
> and evidence submitted before the trial court. A finding of an error
> in law is a legitimate ground for reversal, but a difference of opinion
> on credibility of witnesses and evidence is not. The determination of
> credibility of testimony and evidence must not be encroached upon
> by a reviewing tribunal, especially to the extent where the appellate
> court relies on unchallenged, excluded evidence in order to justify
> its reversal.

*Id.* The trier of fact is free to believe all, part, or none of the testimony of any witness
who appears before it. *McKinley v. Kuhn,* at ¶ 13.

### B.  Did Cochenour Knowingly Cause Mental Distress?

{¶19}  In his first assignment of error Cochenour argues that the trial court
abused its discretion in finding that he "acted 'knowingly'" in causing McNaughton
mental distress.  He claims that he testified repeatedly that he did not know his pattern

of conduct would produce fear of harm in McNaughton or mental distress, i.e. he did not subjectively intend to cause her mental distress.

**{¶20}** A petitioner must demonstrate by a preponderance of the evidence that the respondent has engaged in menacing by stalking in violation of R.C. 2903.211. *Strausser v. White,* 8th Dist. Cuyahoga App. No. 92091, 2009-Ohio-3597, ¶ 30; *Caban v. Ransome,* 7th Dist. Mahoning App. No. 08MA36, 2009-Ohio-1034, ¶ 7. The menacing by stalking statute, R.C. 2903.211(A)(1), provides: "No person by engaging in a pattern of conduct shall knowingly cause another person to believe that the offender will cause physical harm to the other person or cause mental distress to the other person."

**{¶21}** The term "knowingly" is defined in R.C. 2901.22(B):

A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist.

**{¶22}** Thus, a petitioner seeking a civil stalking protection order under R.C. 2903.211 is not required to prove either purpose or intent to cause physical harm or mental distress. It is enough that the alleged offender knowingly preformed an act that resulted in causing the victim mental distress. *See Caban v. Ransome*, at ¶ 21-24. In other words, the offender's subjective intent is not relevant under R.C. 2903.211. Instead the issue is whether the offender acts when he is aware that his conduct will probably cause mental distress, regardless of whether it was his purpose to cause that result.

**{¶23}** Here Cochenour admitted to sending the trademark violation letter to McNaughton's employer knowing that his conduct would probably cause the employer

to call the phone number listed in the letter. However, he claims he did not know that it would probably cause them to believe he was making threats. He testified that he believed that at some point they would learn his identity and he would reveal his true purpose for sending the letter.

**{¶24}** However, Cochenour knew that he was banned from the hardware store at the time he sent the letter because his presence had made the proprietors uncomfortable years ago. Nevertheless he sent an anonymous letter posing as an attorney, threatening legal action and penalties, making explicit suggestions concerning McNaugthon's criminal character, insisting upon a meeting with McNaughton and her employer and ending with the warning, "Real tigers can be very vicious when provoked!"

**{¶25}** Testimony showed that the letter caused McNaughton to be concerned and her employer to feel threatened by the language to the point the employer decided to contact the police and file a report. Cochenour learned of the effect his letter and was instructed by the police to stop contacting McNaughton, but nevertheless continued to pursue her, sending a letter and placing a large sign proclaiming his love for her within a mile from her house. Thus he acted with knowledge that this type of conduct caused McNaughton to be fearful enough to involve the police. Yet he persisted in his pursuit of her affection, knowing his persistence had reached a level of alarm. To say that he was unaware of the result of his conduct is a stretch at best. We overrule his first assignment of error.

## C. Mental Distress

**{¶26}** In his second assignment of error Cochenour argues that there was no credible evidence in the record that McNaughten actually suffered mental distress. In

essence he correctly argues that mere annoyance is not the proper subject for a civil protection order. Mental distress is defined in R.C. 2903.211(D)(2)(a) as any "mental illness or condition that involves some temporary substantial incapacity."

**{¶27}** Incapacity is substantial if it has a significant impact upon the victim's daily life, such as causing a change in one's routine. *Smith v. Wunsch,* 162 Ohio App.3d 21, 2005-Ohio-3498, ¶ 20 (4th Dist.).

**{¶28}** However, "Mental distress need not be incapacitating or debilitating." *McKinley v. Kuhn*, at ¶ 17. "[A] trial court may rely on its knowledge and experience in determining whether the petitioner suffered mental distress." *Id.*

**{¶29}** The police report concerning the "Tiger" incident reveals McNaughton was leery of any contact with Cochenour. The police report concerning the sign incident shows that McNaughton was "in fear" because she "lives alone" and is "stressed" about what Cochenour "may or may not do to her." The police report states that she believes his actions were becoming more frequent and bizarre. She testified that she believed Cochenour had recently become mentally unstable and in need of help; so much so that she had contacted the police twice. The magistrate witnessed Cochenour's and McNaughton's character and demeanor and assessed their credibility at the hearing. As the trier of fact, the trial court was free to draw its own conclusions about credibility and to disbelieve all, part, or none of their testimony. We typically defer to trial courts on issues of weight and credibility because the trial court observed demeanor, gestures and voice inflections and uses those in weighing testimony. *Smith v. Wunsch*, 162 Ohio App.3d 21, 2005-Ohio-3498, 832 N.E.2d 757, ¶ 21 (4th Dist.).

**{¶30}** The record would allow a rational decision maker to find that McNaughton suffered mental distress. She reported to the police that she lives alone, is in fear of Cochenour's increasingly bizarre and frequent actions, wondering what he might do to her; she was stressed, upset and uncomfortable that Cochenour would come within a mile of her home to erect a large "I love you" sign along the roadway.   Testimony that a respondent's conduct caused the person considerable fear can support a finding of mental distress. *Middletown v. Jones*, 167 Ohio App.3d 679, 683, 2006-Ohio-3465, 856 N.E.2d 1003, 1006, ¶ 8 (12th Dist.) (testimony that petitioner felt "nervous," "frightened," "upset," "worried," and "scared"  was sufficient to support a finding of mental distress). We find no abuse of discretion in the trial court's finding that Cochenour knowingly caused McNaughton to suffer mental distress as a result of his persistent conduct, which exceeded the level of a mere annoyance and became threatening or alarming to its recipient. Therefore, we overrule his second assignment of error.

## IV. CONCLUSION

**{¶31}** We find no abuse of discretion in the trial court's decision granting McNaughton's petition for a civil stalking protection order against Cochenour.

JUDGMENT AFFIRMED.

## **JUDGMENT ENTRY**

It is ordered that the JUDGMENT IS AFFIRMED and that Appellant shall pay the costs.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Ross County Court of Common Pleas to carry this judgment into execution.

Any stay previously granted by this Court is hereby terminated as of the date of this entry.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Abele, J. & McFarland, A.J.:  Concur in Judgment and Opinion.


For the Court


BY: _____
William H. Harsha, Judge


## **NOTICE TO COUNSEL**

**Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**