[Cite as *McCloud v. Baker*, 2022-Ohio-1307.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
HOCKING COUNTY

TYLER MCCLOUD, ET. AL.,          :

                                  :

     Petitioners-Appellees,      :     Case No. 21CA3

                                  :

     v.                         :

                                  :     DECISION AND JUDGMENT

MARION BAKER,             :     ENTRY

                                  :

     Respondent-Appellant.     :

_____

APPEARANCES:

William L. Archer, Jr., Circleville, Ohio, for Appellant.

Jonathan Getson, Baum Law Office, Lancaster, Ohio, for Appellees.[1]

_____

Smith, P.J.

{¶1} Marion Baker, "Appellant," appeals the decision of the Hocking County Court of Common Pleas, filed February 5, 2021, which found by a preponderance of evidence that Appellant did engage in menacing by stalking towards Appellee Tyler McCloud, "Tyler," and his wife, Kayla Painter, and that a civil stalking protection order was necessary to protect the persons named in the order.[2] Appellant contends that the trial court's

---

[1]While Tyler McCloud was represented by Attorney Getson in the trial court proceedings, neither Mr. McCloud nor any attorney on his behalf has filed a brief in this appeal.
[2]While Tyler McCloud and Kayla Painter testified they are married, Kayla is referenced in these proceedings as Kayla Painter. Furthermore, while Kayla is listed as a protected party, she was not a petitioner in this matter. Therefore, in the interest of clarity throughout the opinion, we have decided to

decision is against the manifest weight and sufficiency of the evidence. For the reasons that follow, we find the trial court did not abuse its discretion with regard to its findings and in issuing the protection order. As such, we find no merit to Appellant's sole assignment of error and we affirm the judgment of the trial court.

## FACTS

{¶2} Tyler McCloud and Kayla Painter reside on property Kayla purchased in 2017, which adjoins Appellant's property. The nearest public roadway is Long Run Road. Tyler and Kayla's access to Long Run Road is by means of an easement and common driveway shared by Appellant and Kayla.

{¶3} Appellant once owned Kayla's property. When Appellant originally sold the property in 2004, the deed included a provision that required the new owners to pay for one-third of all maintenance costs as to the easement.[3] Kayla is also subject to this provision to be responsible for costs of maintenance. The maintenance provision in Appellant's deed, which was made an exhibit to these proceedings, reads as follows:

> Grantees agree to be responsible for one-third of all maintenance costs associated with the roadway over which they are acquiring an easement, as set forth in Exhibit A,

reference Tyler McCloud as "Tyler" instead of Appellee. When both are referred to we will use "McClouds."
[3]Appellant first sold the property now owned by Kayla to Philip Estep and Annette Estep.

including costs related to maintenance of the roadway, bridge and culverts, up to the point at which the roadway splits and becomes exclusive to the Grantees, from which point Grantees will be responsible for the entire maintenance costs related to the same.

{¶4} Sometime in early October 2020, the parties had a dispute about the costs of gravel for driveway maintenance. On October 20, 2020, Tyler brought a petition for a civil stalking protection order, which the trial court granted ex parte. Kayla was named as an additional protected party. The matter came on for full hearing on October 30, 2020 and on December 28, 2020. Appellant and Tyler both presented several witnesses whose testimonies will be summarized herein.

{¶5} On February 5, 2021, the trial court issued a full civil stalking protection order to be in effect until October 20, 2022. The trial court concluded:

> This Court believes that Mr. Baker's actions caused the McClouds mental distress. This Court believes that the events that caused this include: Mr. Baker riding near the common driveway in his golf cart with a shotgun; sitting in the golf cart staring at the McCloud's home; leaving the backhoe on the township right-of-way in order to obstruct the driveway; telling Mr. McCloud that he, Mr. Baker, would have his grandson or nephew "take care of" Mr. McCloud; and Mr. Baker coming too close to the McCloud home after the issuance of the ex parte order. The fact that the McClouds are scared and concerned about their safety is clear. They have put up cameras to monitor the area around their home due to the actions of Mr. Baker. This Court also believes that there is a pattern

of conduct. All the actions that have occurred have happened since the summer of 2020. * * * This Court believes that Mr. Baker acted while he was aware that Mr. and Mrs. McCloud would suffer mental distress as a result of his actions.

{¶6} This timely appeal followed. Where necessary, additional pertinent facts are set forth below.

## ASSIGNMENT OF ERROR

I. THE TRIAL COURT'S DECISION FINDING THAT APPELLANT ENGAGED IN A PATTERN OF CONDUCT THAT CONSTITUTED MENACING BY STALKING IS AGAINST THE MANIFEST WEIGHT AND SUFFICIENCY OF THE EVIDENCE.

## A. STANDARD OF REVIEW

{¶7} Because the decision on whether to grant a civil protection order is within the trial court's sound discretion, we will not reverse it absent an abuse of that discretion. *See McNaughton v. Cochenour,* 4th Dist. Hocking No. 155CA3479, 2015-Ohio-4648, at ¶ 17; *McKinley v. Kuhn,* 4th Dist. Hocking App. No. 10CA5, 2011-Ohio-134, ¶¶ 12-13; *Smith v. Wunsch,* 162 Ohio App.3d 21, 2005-Ohio-3498, 832 N.E.2d 757, at ¶ 10 (4th Dist.). "The term 'abuse of discretion' * * * implies that the court's attitude is unreasonable, arbitrary or unconscionable.' " *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983). A trial court abuses its discretion when it has taken "a view or action that no conscientious judge

could honestly have taken." *State v. Brady*, 119 Ohio St.3d 375, 2008-Ohio-4493, 894 N.E.2d 671, ¶ 23. To establish an abuse of discretion "the result must be so palpably and grossly violative of fact or logic that it evidences not the exercise of will but the perversity of will, not the exercise of judgment but the defiance of judgment, not the exercise of reason, but instead passion or bias." *Smith v. Wunsch,* 162 Ohio App.3d 21, 26, 2005-Ohio-3498, 832 N.E.2d 757, 761, ¶ 10 (4th Dist.) citing *Vaught v. Cleveland Clinic Found.,* 98 Ohio St.3d 485, 2003-Ohio-2181, 787 N.E.2d 631, ¶ 13; *Nakoff v. Fairview Gen. Hosp.,* 75 Ohio St.3d 254, 256, 662 N.E.2d 1 (1996).

{¶8} "Moreover, an 'appellate court may not simply substitute its judgment for that of the trial court so long as there is some competent, credible evidence to support the lower court findings.' " *McNaughton, supra* at ¶ 18, quoting *State ex rel. Celebrezze v. Environmental Enterprises, Inc.,* 53 Ohio St.3d 147, 154, 559 N.E.2d 1335 (1990). When an appellate court reviews a trial court's judgment, it must generally defer to the fact-finder's weight of the evidence and credibility determinations. *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 81, 461 N.E.2d 1273 (1984). As the Ohio Supreme Court explained in *Seasons Coal:*

> A reviewing court should not reverse a decision simply because it holds a different opinion concerning the

credibility of the witnesses and evidence submitted before the trial court. A finding of an error in law is a legitimate ground for reversal, but a difference of opinion on credibility of witnesses and evidence is not. The determination of credibility of testimony and evidence must not be encroached upon by a reviewing tribunal, especially to the extent where the appellate court relies on unchallenged, excluded evidence in order to justify its reversal. *Id.* The trier of fact is free to believe all, part, or none of the testimony of any witness who appears before it. *McKinley v. Kuhn, at* ¶ 13.

## B. LEGAL ANALYSIS

{¶9} A petitioner must demonstrate by a preponderance of the evidence that the respondent has engaged in menacing by stalking in violation of R.C. 2903.211. *See McNaughton, supra,* at ¶ 20; *Strausser v. White,* 8th Dist. Cuyahoga App. No. 92091, 2009-Ohio-3597, ¶ 30; *Caban v. Ransome,* 7th Dist. Mahoning App. No. 08MA36, 2009-Ohio-1034, ¶ 7. The menacing by stalking statute, R.C. 2903.211(A)(1), provides: "No person by engaging in a pattern of conduct shall knowingly cause another person to believe that the offender will cause physical harm to the other person or cause mental distress to the other person."

1. Did the evidence demonstrate a pattern of conduct?

{¶10} Appellant first asserts that the trial court's decision is not supported by the evidence in that Appellant did not engage in a pattern of conduct. In discussing the testimony of the witnesses, Appellant contends

that Tyler testified to only one incident, and that there was no testimony on any dates when any of the events occurred.

{¶11} Tyler first presented the testimony of Robert Smith, a township trustee. Appellant had a backhoe sitting in the township's right of way for about 5 weeks. Mr. Smith testified that the backhoe situation occurred six months to a year prior. Mr. Smith testified Appellant's claimed reason for placing the backhoe there was to keep people from turning right out of his driveway. Mr. Smith and another trustee contacted Appellant and asked him to remove it. Mr. Smith later told Appellant he was going to be arrested and he finally moved the equipment.

{¶12} Kim Kougher next testified she had rented some land from Appellant. She was also familiar with the McClouds. Kougher admitted she had not witnessed any interactions between the parties. The substance of her testimony was that the piece of equipment was "almost blocking" the driveway and created a "dangerous situation."

{¶13} Lastly, Kayla Painter testified that she is married to Tyler McCloud. She testified that when they first moved into their home, the relationship with Appellant was "really good" the first 18 months to two years. Kayla testified the relationship started to change when her mother moved in with them on Long Run Road. She testified a creek runs through

the properties.  Kayla, her mother, and Kayla's brother, age seven, were in the creek when they noticed trash floating down the creek.  Kayla saw a mattress, broken televisions, tires and "a bunch of trash."

{¶14} Kayla went to talk to Appellant.  Kayla testified she told Appellant she had found trash along the creek bed and asked if he needed help picking it up.  According to Kayla, Appellant replied, "That's my property.  Get off my property.  Stay off my property.  I put my trash out there so the creek does not wash away my property."  Kayla continued offering to help him pick it up.  Appellant then told her he liked arguing with her and Kayla "laughed it off."  She told him she'd talk to him later about it if more trash kept coming.

{¶15} Kayla testified a couple of months passed.  It was summer and the trash was starting to smell.  They discussed the trash three more times within a four to five-month span.  Finally she told him she was picking up the trash.  Kayla testified "[Appellant's] whole persona started to turn."  Appellant had his girlfriend Betty with him and she "got nasty" with Kayla.  Appellant said "Get off my property.  Stay off my property.  I'll do what I want on my property.  Go 'F' yourself."

{¶16} Kayla testified approximately one month later, the EPA "got called" because the smell was "horrendous" and Appellant had dumped

more trash.  Appellant was livid.  He started riding his golf cart with a shotgun in the shared driveway.  He was ranting and raving, calling her "stupid bitch" and "terrible neighbor."

{¶17} Kayla and Appellant had a cell phone conversation.  Kayla didn't realize he could not hear well on the cell phone.  Kayla thought the conversation was peaceful but Appellant misconstrued it.  They met in the driveway later and Appellant openly admitted he had hearing issues.  She told him he misunderstood.  He apologized and things were relatively friendly.  However, Appellant continued to "rant and rage over the cell conversation that never actually happened."

{¶18} Kayla testified to other incidents.  She testified Appellant physically threatened Tyler.  She confronted Appellant.  According to Kayla, Appellant started laughing and said, "Yeah, I said that.  I'm sorry.  I was just heated over gravel."  Appellant also said it "won't happen again."

{¶19} Kayla testified since they had gotten the ex parte order on October 14, 2020, relations had been peaceful.  Prior to that, Kayla and her son were coming home on the driveway when Appellant started running on his back deck.  He had his cane in his hand and was yelling and screaming at her.  Kayla paused for a minute because she thought he needed help.  Then she realized he was cursing at her so she kept driving.

{¶20} Kayla testified Appellant continues to sit in his golf cart on the other side of the creek and stare at her home. He did it once or twice a week and then he will "smirk" and drive the golf cart back to his house. A couple of hours later he will do the same thing again. Kayla testified it made her feel uncomfortable. Four times he would drive up to their bedroom and honk his horn at odd hours.

{¶21} Kayla testified nothing happened until after the EPA was called. Appellant told her he was going to "make her life a living hell" so they will sell their house. Appellant told her he put the tractor at the property line so she couldn't turn right.

{¶22} On cross-examination, Kayla admitted Appellant was sitting in the golf cart on his own property. She admitted there is a dispute over the driveway. Kayla admitted she is required to share costs, but she testified Appellant had gravel placed and then demanded reimbursement. Kayla denied receiving a letter on October 14th asking for reimbursement for the driveway.

{¶23} On re-direct Kayla testified she saw Appellant in his golf cart with a shotgun on the property line multiple times. She has videos prior to

October 14th where they have discussed the driveway. [4]   There is also a third

party responsible for maintenance.  Kayla testified:

> [Appellant said] I can control you this way.  I can see when you come and go.  I can see who you have at your house. I can see everything. * * * He got livid and - - livid.  I'll say directly he said screw you.  I'm not doing that.  You owe me money and I'll get my money one way or the other.  Get the F off my property. And that was the last time I've ever talked to him regarding the stupid gravel.

{¶24} On re-cross, Kayla admitted officers came to the property twice

and did not do a report.  She testified it is a coincidence that Tyler filed the

protection order six days after receiving the letter.

{¶25} The proceedings were continued to December 28, 2020.  On

that date, Tyler McCloud testified he resides with Kayla on the property but

he is not a co-owner.  He is aware that Kayla is obligated to pay for gravel.

Appellant and Kayla had a dispute over an easement Kayla wished to buy in

2018, but Appellant was unreasonable.

> [O]ne time we went over to discuss and reason with him about gravel and he wanted the money and I told him I'd get it to him and - - because we were a little tight.  And he said, well, if I don't have it I'm going to bring over my grandson or my nephew and I'm going to have them take care of you.

{¶26} Tyler testified he had witnessed Appellant with his gun

---

[4]While these videos were not allowed into evidence, her testimony indicates the threatening incidents occurred prior to October 14, 2020, the day they filed for the ex parte order.

in the golf cart on the property line once. Based on these incidents, Tyler believed he was being threatened. He has put up cameras on his driveway and house. There have been no incidents since he installed the cameras. Tyler filed for the civil protection order on October 20, 2020. Appellant has been within 500 feet of the house, as against the order, multiple times.

{¶27} At the close of Tyler's case, Petitioner's Exhibits A-D were admitted into evidence. Exhibit A is an aerial view of the adjoining properties from the Hocking County Engineer's office. Exhibit B is the deed from the Esteps to Kayla Painter's property. Exhibit C is the deed from Appellant to the Esteps, with the clause regarding the road maintenance agreement. Exhibit D is a collection letter to Tyler from Attorney Stephen Proctor and on behalf of Appellant for collection of money for gravel.

{¶28} Appellant then presented his witnesses. David Hume testified he resides on Long Run Road and is familiar with Appellant and his property. He visits Appellant four to five times a week. Mr. Hume testified a tractor was parked at the end of Appellant's driveway but it wasn't blocking the entrance and did not prevent him from exiting. Hume testified he had never witnessed Appellant threatening the McClouds, but on cross-examination admitted he had not been present when the McClouds and Appellant were together.

{¶29} Betty Howell testified she has been dating Appellant for four and a half years. She resides in Columbus, Ohio. She comes to Appellant's home every other weekend. She witnessed one conversation a couple of years prior:

> We went over to their house to talk about the easement. And the price Marion wanted, Kayla said no, that it was too much money. I think he said 15 or 18,000 for a couple of acres. And then Marion said, well, I'll tell you what I'll do. I'll trade you easements from the south easement to the north easement, which would go right directly into their house, for the easement on the south side of their house. And well, Kayla jumped up and said no. She didn't want to trade easements.

{¶30} Ms. Howell testified she had never witnessed Appellant threatening the McClouds and that he was "about the gentlest person I've ever seen." She denied seeing Appellant drive his golf cart with a shotgun to the edge of the McClouds property. On cross-examination, Ms. Howell admitted she would not know what goes on between the neighbors during the weekdays.

{¶31} Finally, Appellant testified he resides on Long Run Road, was 77 years old, and had never been convicted of a crime. He testified there was a dispute with Kayla about purchase of an easement. There was also a dispute about the division of costs for gravel on the shared driveway. Appellant testified:

Yeah, they just didn't pay. I took prices over there and put it on their door. The only time I went over there it wasn't to [cross] the property, it was to collect my money that they owed for that gravel.

{¶32} Appellant denied threatening the McClouds or telling them that he'd bring somebody to "take care of them." He testified he told them that "if I come over there any more, I'm bringing somebody with me so I would have a witness so they couldn't misarrange my wording as to what took place."

{¶33} Appellant identified Exhibit D, the collection letter, and testified it was totally ignored.

{¶34} Appellant explained that he took his tractor to the end of his driveway to move a big rock. The tractor was on his property the entire time and was not blocking their easement. Appellant also testified that he asked them not to run across his property because it "caused a lot of washout." There is no driveway now because of the erosion.

{¶35} Appellant testified after they had problems, Kayla chose to call the health department. The health department inspected, found no problems, and did not cite Appellant. Appellant denied threatening the McClouds or threatening to kill their dog. He also denied going to the property line with a shotgun and watching them. On cross-examination, Appellant admitted the

trustees helped him move the equipment but was adamant that the shared driveway was never blocked at any time.

{¶36} Based on the foregoing, we find the trial court did not abuse its discretion in finding a pattern of conduct existed. The trial court found a pattern of conduct existed because all the menacing incidents had occurred since the summer of 2020. Mr. Smith the trustee testified that the backhoe situation had occurred within the last six months to a year, which would have been, at the time of the October hearing, would have been at least May of 2020.[5]

{¶37} The trial court cited the events that Tyler and Kayla testified to, such as Appellant's riding near the common driveway in his golf cart with a shotgun; sitting in the golf cart staring at the McClouds' home; leaving the backhoe in the right of way; telling Tyler he would have someone "take care of" him; and coming close to the McCloud home even after a protection order was in place. These events demonstrate a pattern of conduct.

{¶38} While this court may have made different credibility determinations and findings, the trial court was in the best position to draw the ultimate conclusions. The trial court apparently found Tyler and Kayla's

---

[5]Kayla purchased her property in June 2017. She testified their relationship with Appellant was good until 18 months to 2 years later, which would put the time at June 2019 when the problems began with her complaints of the trash in the creek. She further testified that the events unfolded in the months following that discovery, which would have continued into early 2020.

testimony regarding Appellant's menacing actions to be more credible than

Appellant's version of the events.  We will not second-guess the trial court's

findings and determinations.

2.  <u>Did the evidence demonstrate Tyler suffered mental distress?</u>

{¶39} Appellant also asserts that Appellee did not suffer mental

distress as defined by R.C. 2903.211(D)(2).  Appellant contends that there

was no description of any mental distress by Tyler and Kayla.  Tyler simply

responded affirmatively to a leading question that he "felt threatened."

Again, we disagree with Appellant and find the trial court did not abuse its

discretion in finding that Tyler suffered mental distress.

{¶40} The trial court found it to be clear that Tyler and Kayla were

concerned about their safety.  Both testified that they had installed cameras

on their property due to Appellant's actions as the court described above.

Both Tyler and Kayla responded affirmatively to the court's inquiry about

mental distress.  Kayla responded affirmatively that Appellant's actions

made her feel uncomfortable.  Again, the trial court found them to be

credible witnesses.  The trial court concluded that Appellant acted in a

manner that he would have been aware that his actions would have caused

Tyler and Kayla mental distress.  Again, while we may have found

differently, the trial court was in the best position to determine credibility and we will not disturb its findings.

{¶41} Based on the foregoing, we find no abuse of discretion in the trial court's decision granting Tyler's petition for a civil stalking protection order against Appellant. Consequently, we overrule the sole assignment of error and affirm the judgment of the trial court.

**JUDGMENT AFFIRMED.**

## **JUDGMENT ENTRY**

It is ordered that the JUDGMENT BE AFFIRMED and costs be assessed to Appellant.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Hocking County Common Pleas Court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Abele, J. and Hess, J. concur in Judgment and Opinion.

For the Court,

_____
Jason P. Smith
Presiding Judge

## **NOTICE TO COUNSEL**

**Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**